BERTIE M. BOYER ET AL V. J. C. POOL ET AL

No. A-4762. Decided April 6, 1955.
Rehearing overruled July 27, 1955.
(280 S.W. 2d Series 564)

*P. M. Rice,* of Hamilton, *L. Brann,* of Lubbock, *Bryan, Maxwell, Bryan & Wilson,* and *Stansell Bryan,* all of Waco, for petitioners.

The Court of Civil Appeals erred in holding that there was sufficient evidence to sustain the finding of the jury that the will of Jasper Pool, deceased, was the result of undue influence, because there was no evidence of probative force to establish that fact. Price v. Taliaferro, 254 S.W. 2d 157; Nailhaus v. Feigon, 244 S.W. 2d 235; Long v. Long, 133 Texas 96, 125 S.W. 2d 1034.

*Trueman E. Roberts,* of Hico, *H. W. Allen,* of Hamilton, *Abney, Hammett & Lynch* and *J. V. Hammett,* all of Lampassas, for respondents.

In response to contentions of petitioners cited Barksdale v. Robbins, 141 S.W. 2d 1035; Rounds v. Coleman, 189 S.W. 1086; Craycroft v. Crawford, 285 S.W. 275.

MR. JUSTICE WILSON delivered the opinion of the Court.

This is a contest to the probating of a will upon grounds of undue influence.

The contestants secured a jury finding that the execution of the will had resulted from the exercise of undue influence. The trial court disregarded this verdict and entered judgment sustaining the probate, because, in its opinion, there was no evidence of undue influence. This judgment has been reversed and rendered by the Court of Civil Appeals. 268 S.W. 2d 223.

■ The only question presented is whether there is any evidence of undue influence. The test of undue influence is whether such control was exercised over the mind of the testator as to overcome his free agency and free will and to substitute the will of another so as to cause the testator to do what he would not otherwise have done but for such control. Scott v. Townsend, 106 Texas 322, 166 S.W. 1138; Curry v. Curry, 153 Texas 421, 270 S.W. 2d 208.

The Court of Civil Appeals gives a fair summary of the testimony. This establishes in substance that the testator was eighty nine years old when he executed the will and subsequently died at the age of ninety three years; that there was friction, jeolusy, and bad feeling between his daughters and the widow

of a deceased son; that his daughters gave considerable thought and attention to the question of whether his son (deceased father of contestants) owed a debt to the testator which should be taken into consideration by the testator in drawing his will; that they discussed this question among themselves and with him at various times; and that there was general rivalry and jealousy between the daughters and their sister-in-law, the wife of the deceased son of the testator. There is testimony that the testator told his grandchildren (contestants) that he would provide for them while the will does not do that. The contestants established a confidential relationship, the opportunity, and a motive for undue influence and that during his last years the testator was virtually dependent upon his daughters, two of the principal beneficiaries. There is proof that the daughters made a daily charge for nursing their brother during his last illness, which indicates a grasping attitude by the daughters and a harsh and unnatural family relationship. Proof of this type simply sets the stage. Contestants must go forward and prove in some fashion that the will as written resulted from the daughters substituting their mind and will for that of the testator. Here the will and the circumstances raise suspicion, but it does not supply proof of the vital facts of undue influence —the substitution of a plan of testamentary disposition by another as the will of the testator.

The proof fails to show the circumstances under which the will was executed other than as set out by the Court of Civil Appeals from whose opinion we quote as follows:

"The record here is silent as to who prepared the will of Jasper Pool; however, both parties assumed in their briefs that the will of Jasper Pool, here tendered for probate, was prepared by the Hon. P. M. Rice of Hamilton. Judge Rice did not testify. The record here shows that the will was executed by the testator in the County Clerk's office at the courthouse in Hamilton. There is an absence of testimony as to how the testator got in touch with Judge Rice; however, Mrs. Boyer testified to the effect that she did not know about the execution of the will until sometime after it was executed and she did not know how her father got to Hamilton but later learned that a former acquaintance by the name of Edwards took her father in a car to Hamilton. (Edwards was not tendered as a witness). There is an absence of testimony as to whether the will was prepared by Judge Rice on the day it was executed, as well as an absence of testimony as to who employed Judge Rice to prepare the will and who gave him the instructions as to the provisions of the will. The will was typewritten and was attested by three subscribing

witnesses. There is no evidence that Jasper Pool had been in Hamilton at any time just prior to the time that he executed the will, or that he had seen and talked with Judge Rice."

One factor to be considered is that the will was executed in a public place (court house) with no one present who is alleged to have used undue influence at that time. In Besteiro v. Besteiro, Texas Com. App., 65 S.W. 2d 759, 761, this Court said:

"The undue influence which will vitiate a will must be exercised at the time of its making. Holt v. Guerguin, supra. 156 S.W. 581) We think the same rule applies to the deed in question. In this connection we hold that, if there was evidence to show that either Maria Inez or Rosalia had unduly influenced the execution of this deed by acts done or things said prior to its execution, and that such acts done or things said operated unduly on the mother's mind, so as to destroy her free agency at the time the deed was actually executed, then it could be said in law that such undue influence was exercised at the execution of the deed."

See also Cameron v. Houston Land & Trust Co., Texas Civ. App., 1948, 175 S.W. 2d 468, error ref. w.o.m.; and Naihaus et al v. Feigon, Texas Civ. App. 1951, 244 S.W. 2d 325, n.r.e.

■ In fact it is not shown that any of the children had any knowledge that the will was being executed until afterwards. There is no evidence of the direct intervention of the will and mind of the daughters or of the dominance of the free will of the testator in the preparation and execution of the will so as to bring this case within Long v. Long, 133 Texas 96, 125 S.W. 2d 1034. The fact that the testator in his will adopted the daughter's version of the debt question does not prove that he did not so of his own free will. There is no proof raising a fact issue that the testator did not make a free decision. Proof that the daughters were favored and that the contestants got nothing under the will is not proof that the daughters did in fact substitute their mind and will for the mind and will of the testator. Since witnesses were available to establish the facts surrounding the preparation and planning of the will, we must hold that the contestants have failed to prove their case. Proof of the planning and preparation of the will, where the witnesses are available, is the heart of an undue influence case.

■ Rspondents urge the case of Barksdale v. Dobbins, Texas Civ. App. 1940, 141 S.W. 2d 1035, error ref., in which the facts

were very like the case at bar and in which a jury verdict of undue influence was sustained. The factual situations in undue influence cases are never the same. The distinction between proving undue influence by circumstantial evidence and merely raising a "bare suspicion" as in Burgess v. Sylvester, 143 Texas 25, 182 S.W. 2d 358, is not one which can be defined with certain limits, for the problem is essentially one of degree.

In the case of Barksdale v. Dobbins, supra, there was evidence that the testator was mentally feeble and that his mental condition had deteriorated with age. In the case at bar there is no such testimony. A number of witnesses testified that testator was active and spry, drove his car under a limited driver's license, and in general took care of his own business. The only testimony which we can find in the record which might be contended as suggesting mental weakness was that of a neighbor, Gordon Nettleton, who had known testator a long time. it is:

"Q. What did you consider his mental condition during the last few years?

"A. Well, he was all right, I thought.

"Q. Would you discuss things with him, affairs of the community, and politics and such things?

"A. Yes, I would play dominoes with him and talk about all that, a right smart.

"Q. A good portion of the last part of his life he would go to Shive and play dominoes?

"A. Yes.

"Q. Was he apparently a man of strong mind?

"A. Yes, I would think so.

"Q. As to whether he was a man easy to influence?

"A. Well, I don't know about that. He might could be influenced. I don't know, but he always seemed right fair."

But when this testimony is fairly examined in its context it will not make a fact issue of mental weakness.

Two medical witnesses testified for the proponents. The contestants offered no medical evidence of the testator's mental strength and condition. Dr. H. R. Nassour, Jr., testified that he was the physician and surgeon who had treated the testator for about four years before his last illness and through and includ-

ing his last illness. He testified that his death was due to a general weakness brought on by a chronic kidney condition and hardening of the arteries; that hardening of the arteries generally sets in at the age of forty and continues progressively until death in most people and affects people differently. He testified as follows:

"Q. I will ask you whether or not you took notice of him with reference to his ability and his capacity. He was an old man?

"A. Well, he was old in some ways but quite a spry fellow.

"Q. He was more active than ordinarily for a man of 90 years?

"A. I would say much more so.

"Q. In his last illness he spent several weeks in your institution?

"A. Quite a few months.

"Q. Under your treatment?

"A. That is right.

"Q. I will ask whether or not there was anything wrong with his mental condition? at that time?

"A. Not that I noticed until the last two or three days of his life.

"Q. He was apparently sane and alert up until the last?

"A. Very alert, yes.

"Q. Is it your opinion that he was of sound mind all those months except the last two or three days?

"A. It is.

\* \* \* \* \*

"Q. He did have the evidences of an old man?

"A. Well, he was I think about 90 or so. During his last illness, I would say during the beginning of his last illness, physically and mentally I would say he was just as alert as a person of 60. Some of us get old, a whole lot of us quicker than others. Some people of 50 years of age are just as old as he was at 90."

Dr. R. A. Kooken testified that he had known the testator between fifteen and twenty years and had treated him at various times during the years between 1948 and 1951, which includes

the period during which this will was drawn. He testified as follows:

"Q. As he approached 90 I will ask if he was apparently soound for a man of that age?

"A. I would say exceptionally so.

"Q. It was a matter of note that he was an active man in his old age?

"A. That is right.

"Q. I will ask you whether you would consider him to be a man of strong mind and fixed convictions and strong mentally?

"A. My impression was when I treated him that he was mentally alert. * * *"

* * * * *

"Q. During the time you saw him in 1950 and 1951 and I believe July, 1951, was there any evidence of mental decay at that time?

"A. Nothing specific. I think he was exceptionally alert for a man of his age. Of course it was, he was rather talkative, which most of us are when we get old; would have a pretty long visit when I was in his office, but I saw no evidence of any mental disturbance while he was in the office."

We have concluded that this medical testimony distinguishes the case at bar from Barksdale v. Dobbins, supra. In that case there was testimony that the testator "had reached that age and part of life where he was easily influenced; had a mind like a child and was not capable of taking care of his business." There was testimony that the testator " 'will sign anything anybody asks him to'." Whenever the testator left his home he had to be accompanied. Also in that case the attorney who drafted the will testified as to its detailed preparation. In addition, in this case the testator offered an explanation for leaving out his grandchildren while in that case there was no explanation.

The judgment of the Court of Civil Appeals is reversed and that of the trial court affirmed. Costs are taxed against respondents.

Chief Justice Hickman not sitting.

Opinion delivered April 6, 1955.

Mr. Justice Smith joined by Justice Brewster dissenting.

I respectfully dissent.

Since this is a case wherein the petitioners contend that the respondents failed to produce any evidence to support the finding of the jury that petitioners exercised undue influence upon the testator, Jasper Pool, I find it necessary to depart from the usual procedure and quote at some length from the testimony. I realize that it is a tremendous burden to analyze the cold record in this Court and at the same time effectivtly bring out the true picture. This Court, in determining the only question before us, must necessarily remember that the jury is the best judge of the credibility of the witnesses and the weight to be given their testimony. The jurors are the judges not only of the facts proved but also of the inferences to be drawn therefrom, provided that such inferences are not unreasonable. It is the duty of the jury to consider the evidence as a whole. It has the power to reject or accept all or any part of the testimony of any witness. When testimony is given which calls for an explanation and the adversary remains silent, the jury may take such silence into consideration in deciding the ultimate issue submitted.

This being an "undue influence" case, the trial court defined "undue influence" as "the exercise of sufficient control over the will power and mind of the person, the validity of whose acts is brought in question, to destroy his free agency and to constrain him to do what he would not have done, if such control had not been exercised; on the other hand, if a person of his own volition and in the exercise of his own will and choice enters into a transaction, then he would not be laboring under undue influence." This definition was followed by one special issue: "Do you find from a preponderance of the evidence in this case that at the time of the making of the will in question herein on March 5, 1949, the said Jasper Pool was induced to make said will by the exercise of undue influence upon him by Mrs. Bertie Boyer and Mrs. Bessie Blake, or either of them?"

No objection was made to the charge by either petitioners or respondents. With the charge of the court as a legal guide, the jury weighed all the evidence and answered the issue in the affirmative. Undue influence may be shown to be operative at the time of the execution of the will by showing facts and circumstances before and after execution thereof from which it might be inferred that the undue influence existed and operated

at the time the will was executed. The activity of the proponent of a will may be shown solely by inference. Direct evidence connecting the proponent with the actual preparation of the will is not an absolute requirement to prove undue influence. The contestant is not required to prove that the propouent or beneficiary was present at the time of the execution of the will. For example, in the case of Scott v. Townsend, 106 Texas 322, 166 S.W. 1138, the proponent was in St. Louis when the will was signed in Ft. Worth. I am mindful of the fact that the majority is thoroughly familiar with these well settled principles, however, I feel called upon to point up these rules in view of the conclusion reached by the majority that the evidence merely raises a "bare suspicion," whereas, I have the opposite reaction in that it is my opinion that all the evidence, considered as a whole, supports the finding of the jury that our petitioners exercised undue influence upon the testator. Undue influence can be established by circumstantial, as well as direct evidence. This Court in the case of Long v. Long, 133 Texas 96, 125 S.W. 2d 1034, 1036, said:

"It is rarely possible to prove undue influence by what is generally known as direct testimony. Undue influence is usually a subtle thing, and by its very nature it usually involves an extended course of dealings and circumstances. Usually a person charging undue influence must substantiate such charges by circumstances extending over a considerable length of time. It is therefore the settled rule that undue influence can be established by what is known as circumstantial, as well as direct, evidence."

Of course, it is elementary that all evidence tending to support a jury's finding must be accepted as true and interpreted in the light most favorable to the prevailing party, and if it can reasonably be supposed that the minds of reasonable men of ordinary intelligence might differ, either as to the weight to be given to the estimony, or to the deductions to be drawn therefrom, it is the duty of this Court to sustain the jury verdict.

This Court should take into consideration another cardinal rule which must be put into play in determining the question of whether or not the circumstantial evidence produced in the mind of the jury a reasonable belief that undue influence was exercised. The rule I have in mind is that isolated pieces of evidence or circumstances cannot be used as a basis for a conclusion that such evidence does not prove that the beneficiaries (petitioners here) substituted their mind and will for the mind

and will of the testator. One circumstance standing alone might be insufficient to show undue influence, but that is not the test. All circumstances shown by the evidence should be considered, and even though none of the circumstances standing alone would be sufficient to show undue influence, if when considered together they produce in the ordinary mind a reasonable belief that undue influence was exerted in the procurement of the will, they are sufficient to sustain such conclusion. Long v. Long, supra; Barksdale v. Dobbins, Texas Civ. App., 141 S.W. 2d 1035, 1038, 1039, writ refused.

The Court in the case of Barksdale v. Dobbins, supra, said:

" 'To authorize the court to take the question from the jury, the evidence must be of such a character that there is no room for ordinary minds to differ as to the conclusion to be drawn from it'."

In determining whether there is any evidence raising the issue of undue influence in this case, the Court should apply the rule that the testimony in its entirety must be considered in the light most favorable to respondents, disregarding any and all conflicts in such testimony, and indulging all inferences and intendments reasonably deducible from the evidence in favor of respondents and against petitioners.

Turning to the record in this case I wish to relate some of the evidence. Mr. Pool was married one time. Mrs. Pool died in 1929. Sometime prior to 1929, they had executed mutual wills, and at her death all the property she possessed passed under the terms of the will to Mr. Pool. Mr. and Mrs. Pool were the parents of four children, Mrs. Boyer, Mrs. Blake, Ernest Pool and John Pool. The husband of Mrs. Boyer died in 1911. Mrs. Boyer then went to live with her father and mother and stayed there in the old home for approximately five years. She moved to Hamilton and in 1920 moved to Waco. In June, 1934, Mrs. Boyer returned to the old home and lived there with her father continuously until the date of his death in 1952. Mrs. Blake went to live in the home in 1945, and continued to live there until the death of Mr. Pool.

John Pool married in 1924. He and his wife lived in Hamilton County from 1924 to 1934. Their four children were born in Hamilton County. During their marriage, John bought the old Eidson place consisting of about 1,500 acres. They lost the place during the depression. After the loss of the Eidson place

in 1930, John and his family moved to the old home place and lived with his father until March, 1934. Some of the respondents were born in the home of their grandfather; others on the "old Eidson place on the mountain nearby."

Mrs. John Pool testified:

"Q. You had some stock left then on the ranch?

"A. Yes.

"Q. Did Mr. Jasper Pool have any connection with your husband's business at that time?

"A. Well, I guess he did. We took the cattle and goats and went back to his farm and they moved in 1934 *and just left everything with him and he grew out of it.* (Emphasis added)

"Q. What amount had you left there when you moved to Oklahoma?

"A. Everything.

"Q. The same as his?

"A. Yes.

"Q. Did you know him claiming any loss to you or your husband?

"A. He did not complain to me, didn't say anything to me. He knew it was the depression that did most of it.

"Q. Lots of people took big losses at the same time?

"A. Sure.

"Q. You are not claiming any part of the Jasper Pool estate for yourself?

"A. Not at all.

"Q. You are here because of your children?

"A. That is all."

John and his wife, Bessie, lived together as husband and wife for 23 years. They were divorced some two or three years before his death. After the divorce, John Pool returned to the old home and lived with his father from 1947 until his death in 1949. During this latter period, petitioners and John operated the farm together with oher lands they rented from other persons. When John returned to the old home in 1947, he was pos-

sessed of some farm machinery and between $2,000.00 and $2,500.00 in cash. This represented his part of the property awarded him in the divorce decree. *The inventory and appraisement of the John Pool estate listed no cash.* It is significant that Jasper Pool, although he was the administrator of the John Pool estate, did not file a claim against the estate. However, the sisters filed claims for nearly the appraised value of the estate. While it is true that John worked the farm and helped increase the value of the Jasper Pool estate, the two sisters filed a claim for "waiting on John C. Pool from January 31 to February 25, 1949, at the rate of $10.00 per day being during the last sickness of said John Pool." The total claim was $260.00. This claim was allowed by the administrator. All this evidence points to the fact that these petitioners were using their old 89 year old father as a figurehead, so to speak. The majority opinion says that the evidence "indicates" a grasping nature. In my opinion, the evidence shows they were not only grasping in their nature, but they also got what they deliberately set out to get. They got all of John's individual estate as well as all his interest in the estate of his father and mother. Mrs. Bessie Blake presented and filed another claim for $514.05 against the John Pool estate and it was allowed in the sum of $514.00. (I don't know why the 5c was deducted.) The value of the estate was appraised at $862.50. Mrs. Blake is the petitioner who did not testify in the trial of this case. There is other evidence in the record which shows that Mr. Jasper Pool did not claim any debt against John Pool.

Mrs. John Pool and all of the respondents testified that they had never heard of any debt until after the death of their father and that was the assertion of a debt by "Aunt Bessie." One of the boys testified:

"Q. Did you ever hear anyone mention debts your father owed outside of Bessie and Bertie; did you hear them mention it?

"A. Well, when Dad died they come down here and we were trying to settle up. Was sitting in the front room where Grandpa usually sat, and he was sitting there, and about to settle up, and Aunt Bessie come in and she kept talking about those old debts or something that I didn't know anything about and Aunt Bertie come in and she would start it up, and it would keep going back and forth, and things like that."

Louise Pool, one of the respondents, testified:

"We were down here when Dad died and every time we would

think we had settled up what he owed, the doctor bill and funeral bill, they would bring up the old debt.

"Q. Who?

"A. Aunt Bertie and Aunt Bessie."

Bessie Pool, mother of respondents, further testified:

"Q. Do you know of Mr. Jasper Pool advancing your husband (John) any money? What do you know about any financial loss Mr. Jasper Pool might have suffered on account of your husband?

"A. I don't know of any until when the Eidson land was lost —and the goats and cattle and the depression—*he didn't lose at that time.*" (Emphasis added)

Such testimony, when considered in connection with the fact that Mr. Jasper Pool never claimed any debt, either by word or by act as administrator or otherwise than in the will, is affirmative proof that the statements in the will are without foundation in fact.

Louise Pool testified that Aunt Bertie and Aunt Bessie brought up the old debt several times, but that her Grandfather did not mention the old debt at any time. The jury in effect answered this issue against the petitioners. The last will of Mr. Pool contains a bequest to Mrs. Boyer and Mrs. Blake of $2,000 each, *"because I think they deserve it."* Mrs. Boyer testified that she claimed the money from the John Pool estate because *"I think I am entitled to it."* (Emphasis added). The will of John Pool mentions an "unfortunate business transaction." The petitioners were the only ones who constantly "brought up" an old debt as a result of the loss of the ranch and the goats. The petitioners did not mention this supposed old debt until after John's death.

The will was executed only eight days after the death of John Pool and a few days after the petitioners broke up the conference between the grandfather and the children of John Pool. The petitioners exhibited a very hostile attitude towards the respondents and the mother, Bessie Pool.

Billie Pool testified:

"Q. Did he (Jasper Pool) take you off to visit with him in the pasture where you would be alone and things of that kind?

"A. Yes, he has.

"Q. Did Mrs. Blake and Mrs. Boyer object to that?

"A. Yes, it seems like they did.

"Q. How did they act when you would visit?

"A. Well, I don't know. They never did act like they was too well pleased with us coming down."

Louise Pool testified to the following incident occuring on one of the visits:

"Q. When did the pistol come up?

"A. After they had taken the .22.

"Q. How about this pistol; how did you know about that?

"A. Well, when they were going back in the house with the twenty-two I asked Aunt Bertie where she was going hunting, and she told me, no, that Aunt Bessie (the one who failed to testify) always lost her head when she saw my mother and that she just shouldn't come out there. About that time Aunt Bessie went back in the house and she was calling my mother all kinds of things and I had a fuss with her and she went on upstairs and she come back down and Billie was in the hall then, and she made the remark at the time that she loaded that gun six years ago to kill that black bitch and she was talking about my mother. Billie asked what was in the sack and she said it wasn't any 'of his damn business.' And he took the sack away from her and it was a pistol.

"Q. Did your grandfather take part in this?

"A. No, he tried to settle us all down, said he hated for it to come up."

In this connection I quote from the opinion of the Court of Civil Appeals a statement of evidence that is in the record, as follows:

"Mrs. Boyer also testified to the effect that after she moved into the home of her father that she took care of him, bought the groceries, coked for him and the hired man, nursed her father many times, and did the farming and took care of the stock, and that she was aided in these matters by her sister, Mrs. Blake, who came to live with her father and her sister in 1945; that she and Mrs. Blake drove him in the car when he had to travel farther than his restricted license permitted, which was approximately three miles to the store called 'Shive'; however,

Mrs. Boyer said that her father did at times drive his car farther than he was authorized to do under his license, and that he had at times driven to Hamilton. No exact time or date was given, however. *Mrs. Boyer also testified to the effect that her father rented the place to her and her sister in 1945 and at that time they talked with him about his making a will, but he made no will then.*" (Emphasis added) (268 S.W. 2d 227).

The fact remains that Mrs. Jasper Pool died in 1929. Prior to her death, Mr. and Mrs. Pool had executed mutual wills. Upon her death the title to all property owned by her passed to Mr. Pool under the terms of the will. Mr. Pool lived for nearly 20 years without making a will which had the effect of disinheriting the grandchildren for whom, according to the evidence, he had the greatest love. I will say, too, that the separation of John and Bessie did not cause Mr. Pool to dislike Bessie. They continued their very cordial relations during the years. A conclusion could have easily been drawn by the jury that Mr. Pool had the fullest intention to provide for his grandchildren as well as the petitioners and their brother, Ernest. The evidence shows that the grandfather in order to talk to the grandchildren about their father's affairs and about what would happen to his property after his death, would have to take them away from the house and out of the presence of Mrs. Boyer and Mrs. Blake. Another significant circumstance is the fact that John Pool stood by his father and returned to him to live and die. John was a veteran of World War I and was in the hospital at least on two different occasions for four to six months at a time and the government paid all expenses. Mr. Pool was not caused to pay one cent. The receord is clear that had the petitioners promptly notified the grandchildren the same course would have been followed in the case of John's last illness. There was some reason the petitioners did not want these respondents around. The jury had the right to infer at least that petitioners were making every effort to obtain John's part of the property that he had helped accumulate. The grandchildren did not neglect their father and did not lose their love and respect for him. They visited their father and grandfather and the best family relationship existed until petitioners would interfere. It is significant that even though the petitioners called the mother of respondents vile names and threatened to kill her, these respondents, according to the record, never once abused the petitioners. The only thing they did was to take the gun away from one of the petitioners. The only thing they did was to take the gun away from one of the petitioners. Mr. Pool expressed great regret at this occurrence. He grieved to the extent that he had

to lie down. He wanted peace. He always told his grandchildren that they would be taken care of. Mrs. Boyer in her testimony referred to a conversation their grandfather had with these respondents about what they would get from the estate. Mrs. Boyer claimed that these grandchildren "had driven our Dad to his grave and would be glad we got our grandfather there." The record just doesn't support such charge and the jury found against petitioners.

The disinheritance of these respondents is an unnatural act. There existed between this grandfather and these grandchildren, both before and after the signing of the will, that mutual bond of love and affection so often existing between a grandparent and grandchildren. Under the record in this case one would normally infer that the death of his son, John, would have strengthened the tie, but here we find the act of disinheritance on the eighth day following the death of John, the father of the respondents. The expressions of disinheritance contained in the last will of Mr. Pool run counter to the true relationship between Mr. Pool and his grandchildren.

Getting back to the administration of the John Pool estate, I desire to make it clear that I do not contend there was collusion between Mr. Pool and the lady petitioners, but I am of the opinion that Mr. Pool was not fully aware of what was taking place, or that he was unable to withstand the demands of Mrs. Boyer and Mrs. Blake. The same conclusion is inescapable with reference to the clause in Mr. Pool's will which reads:

"I do not leave anything to the four grandchildren of my son John C. Pool for the reason that the said John C. Pool having been unfortunate in some of his business transactions and having been unwell a considerable portion of his life I have paid out money to him and for him in excess of what his just share would be. In order there may be no question about my intentions in this matter I leave to his children J. C. Pool, Jr., Louise Pool, Billie Pool and Kenneth Pool the sum of One Dollar each."

The fact that Mr. Pool went to the courthouse and requested persons to witness his will does not mean that he knew the contents of the will.

I now consider the evidence concerning the extreme old age, general weakness and mental and physical infirmity which was offered so that the jury in this case could weigh his susceptibility to influence, and his power of resistance to such influence. In this connection it shall be my purpose to demonstrate from the evi-

dence the unusual circumstances under which the will was prepared and executed. This development will include the complete silence of the attorney who prepared the will, and the failure of the petitioners to deny the testimony of respondents. The circumstances under which the will was signed demanded an explanation from the petitioners and their attorney. I cast no reflection upon the attorney. I infer from this record that he fully appreciatel the sanctity of an oath and therefore remained silent. Be that as it may, when Mrs. Boyer testified that she did not "bring Mr. Pool to town" and that she learned later that a Mr. Edwards did so, but was not subpoeaned as a witness, although Mr. Edwards lived in the county, and when Mrs. Blake failed to testify, and when the attesting witnesses knew absolutely nothing about the preparation or contents of the will, and in view of all the testimony, circumstantially and otherwise, which cast a reasonable doubt as to the will expressing the true will and desire of Mr. Pool, the silence of the attorney spoke louder than words.

We do not have a comparable situation to the case of Curry v. Curry, 153 Texas 421, 270 S.W. 2d 208, 212. In that case Mr. Curry, when asked to sign some papers, said: "Hell no, I don't want to sign them, I would like to read them first." Here we have a man 89 years, 11 months and four days old running around the courthouse requesting people to sign his will. No one read it. They simply signed their names as witnesses and testified that he was sound in mind in their opinion.

Mrs. Boyer testified that from 1934 until his death in 1952, she took care of her father, cooked his meals and waited on him; that she did nursing duties "lots of times"; that one time he turned the car over; that she nursed him two weeks but did not charge him $10.00 per day like she did her brother John. The record shows that Mr. Pool died August 29, 1952, at the age of 93 years, four months and 28 days; that he died from "generalized arteriosclerosis," the immediate cause being chronic kidney condition resulting from such arteriosclerosis; that this is a progressive disease over a period of years, manifesting itself generally over the body and affecting the mind as well as the body; that the doctor removed a cancer from the face of Mr. Pool eight months before he died; Mr. Pool was treated by a doctor in February, 1948; September, 1948; October, 1948; April, 1949; September, 1950; October, 1950; December, 1950; February, 1951 and July, 1951. The doctors testified to the above facts. The majority quotes from the testimony of Dr. Nassour, but fails to quote the above testimony. The two doctors

seem to have concentrated more on the question of mental incapacity than whether or not Mr. Pool was susceptible to undue influence. The trial court stated at one time in the course of the proceedings, and while one of the doctors was testifying: "We might observe here, gentlemen, that we are not trying this case on the theory that there was any mental incapacity. That is not raised by the pleadings. The only issue is that of undue influence and that only will be submitted to the jury." Dr. Nassour testified that he had known Mr. Pool about three years. He did not know of the family life. The sum and substance of his testimony is that Mr. Pool was of sound mind, except the last two or three days of his life. Dr. Koöken testified that he had known Mr. Pool fifteen or twenty years; that he did not know anything about his personal or family affairs; that he knew of no personal differences between him and his family. After testifying to the dates of examination of Mr. Pool, as stated above, the doctor further testified:

"Q. If he was 90 years old, are there certain disabilities that affect all people; isn't there a certain amount of senility?

"A. Do you mean to answer that yes or no?

"Q. If you would rather qualify your answer you can do so.

"A. I think that is a pretty open question. Some people show evidence of senility when 50 or 60, and others I would say up to his age do not. *Of course, the majority of people do, yes.*" (Emphasis added.)

"Q. There are certain disabilities that come with old age in all persons?

"A. You mean 80 or 90 age group.

"Q. Yes.?

"A. Most of them have some physical disability and of course the big portion have some mental changes, and there are others I would say that do not. Of course they usually have some peculiar characteristics, the same they have at old age. They are more prone to it.

"Q. He was a patient quite a few times?

"A. Yes. He had certain ailments when I saw him."

The doctor testified that the daughters might have brought him (meaning to his office) but he usually came in the office by himself.

Mr. Nettleton, a witness referred to in the majority opinion, testified:

"Q. Did Mr. Pool drive his car all over the country or just to Shive?

"A. Well, I think he had a three or four mile zone; he was restricted to that particular area around Shive.

"Q. His license would not allow him to operate a car into Hamilton?

"A. I don't think so.

"Q. How long did that continue?

"A. I would not know. The last 3 or 4 years."

As a matter of fact Mr. Pool's license was restricted. He was not completely blind but his vision was so bad that he was not allowed to drive a car on the highways.

In regard to Mr. Pool's love for the grandchildren, Mr. Nettleton testified:

"Q. Did he seem to enjoy these children?

"A. Well, yes, he talked lots about the children. He was fond of them. Yes, that is the way I taken it, that he was glad to see them and enjoyed their visits. His (John's) children all come to Mr. Pool's funeral.

"Q. Mr. Jasper Pool never made any difference between any of the children to you?

"A. No, sir, not that I know of."

One witness testified that "so far as him going to town he had to be brought to town."

The petitioners claim that Jasper Pool attended to a great part of his business, and they cite the testimony of the witnesses, Dempster, Adams, Johnson, Rush and Nix. The witness Dempster did not testify to a single business transaction. The witness Adams testified that he paid his taxes, but that is the only business transaction that she could testify to. Nix did not testify to a single business transaction, other than Jasper Pool asked him to get him a driver's license. The witness Johnson testified to one business transaction during the three years prior to his death; that it was in regard to the sale of some cattle.

"Q. Do you know whether he got his girls' (Mrs. Boyer's and Mrs. Blake's) advice as to whether he ought to sell them or anything like that?

"A. Well, I believe one of the girls owned part of them. I believe they talked it over amongst themselves, not necessarily about his particular end of it; think they were both interested in the cattle."

Mr. Rush testified to only one item of business during the last three years of his life; that Mr. Pool came to his office to talk about an insurance policy; he talked for just a few minutes; Mr. Pool had no business; he had no cash when he died. There is no question but that Mr. Pool was of sound mind, but I believe the evidence of extreme old age, feebleness and senility and illness, rendered him susceptible to control, and that the jury verdict should be upheld. It requires less evidence in such a case as we have here than where the testator was a strong, vigorous person in full possession of all his mental faculties. See Brown v. Pridgen, 56 Texas 124; Moore v. Horne, Texas Civ. App., 136 S.W. 2d 638, writ dismissed, judg. corr.

This record shows that there is no reasonable basis for Mr. Pool, of his own volition, to disinherit his grandchildren. This Court said in the case of Curry v. Curry, supra:

"The deed made an unnatural disposition of the property only in the sense that one child was preferred over the others. This circumstance is frequently present in cases involving the issue of undue influence, but those in which it appears to have been *given weight by the courts involved the absence of a reasonable basis for the preference and the presence of other strong probative circumstances.*" (Emphasis added.)

In that case this Court held in effect that no other probative circumstances existed because we said: "We are left, then, with this question: Will the sole fact that the defendant selected, advised and paid the attorney who prepared the deed support the legal conclusion that the deed was a product of undue influence? We hold that it will not."

The majority quotes from the opinion of the Court of Civil Appeals wherein it is stated that both parties assumed in their briefs that the will of Jasper Pool was prepared by one of the attorneys for petitioners. In regard to this situation, I agree with the Court of Civil Appeals in its conclusion that

"Since there was no testimony tendered as to when and where the scrivener of the will got the information that was placed therein, and since Mrs. Blake and Mrs. Boyer did not attempt to explain their hostility to the grandchildren and contradict the testimony of the contestants, and particularly with reference to Mrs. Boyer's and Mrs. Blake's efforts to interfere with contestants while contestants were talking to their grandfather immediately following their father's death as herein set out, it is our view that their silence under the circumstances is of probative force on the issue of undue influence exerted by them upon the testator. See Craycroft v. Crawford (Texas Com. App., 285 S.W. 275) point 5, and cases there cited. See also Taylor v. Taylor, Texas Civ. App., 248 S.W. 2d 820, no writ history, point 5 on page 824, and cases there cited; Moos v. First State Bank of Uvalde, Texas Civ. App., 60 S.W. 2d 888, writ dis.; 31 C.J.S., Evidence, Sec. 156, page 847; Matthews v. Wilson, Texas Civ. App., 141 S.W. 2d 747, point 1; 64 C.J. 513; 16 Texas Digest, Evidence, Secs. 76 and 590.

"In Sullivan v. Fant, Texas Civ. App., 160 S.W. 612, 616, writ ref., we find this statement of the rule: " 'When the proof tends to establish a fact and at the same time discloses that it is within the power and to the interest of the opposing party to disprove it, if false, the silence of the opposing party not only strengthens the probative force of the affirmative proof but of itself is clothed with a certain probative force.' "

In 31 C.J.S., Evidence, Sec. 156, p. 847 it is said:

"The unexplained failure or refusal of a party to produce evidence may, under certain circumstances, and sometimes as a result of statute, give rise to an inference unfavorable to such party. In the absence of explanation, the failure or refusal of a party to produce evidence may create and adverse inference where such evidence is within his knowledge, and within his power to produce, is not equally accessible to his opponent, and is such as he would naturally produce if it were favorable to him."

I admit that the burden of proof was with the contestants to prove undue influence. But this is not a question of burden of proof. Since the jury could conclude that Mr. Pool did not read the will, and since the attorney admits that he drew the will and did not in the face of the proof that the will was not read, and since such matters were peculiarly within the knowledge of the attorney, who participated in the trial of this case, it was not the burden of respondents to call the attorney as a witness.

As said in the case of Craycroft v. Crawford, Texas Com. App., 285 S.W. 275, "Silence, under the conditions disclosed, in our opinion, had some probative force as pointing to undue influence for a source of the will * * * and as strengthening the unfavorable inferences which the jury may have drawn from the other facts and circumstances."

Under all the circumstances in this case, the extreme old age, infirmity and weakness of Mr. Pool; the dependency of Mr. Pool on Mrs. Boyer and Mrs. Blake for social comfort and peace of mind; the actions of the two petitioners; the conceded opportunity of the two ladies to exercise undue influence on account of their conceded relationship; their demonstrated ability to substitute their own will for the free agency of their father in that throughout they clamed a debt, owed by brother, John, that did not exist, and the fact they had intimate knowledge of Mr. Pool's affairs even to the extent of discussing with their father in 1945 the fact that he had not made a will since the death of their mother, and in that same conversation his statement about making a will, but did not make until 1949, eight days after the death of John; and the further fact, under all the circumstances, that the will was unjust, unreasonable and unnatural in its terms; and the fact of the silence of Mrs. Blake and Mrs. Boyer and their attorney regarding matters peculiarly within their knowledge, and the grasping natures of Mrs. Boyer and Mrs. Blake and their hostility toward the respondents, I am of the opinion that such constitutes some evidence of undue influence of sufficient probative force to raise the issue and required the trial court to submit such issue to the jury. See Long v. Long, supra; Barksdale v. Dobbins, Texas Civ. App., 141 S.W. 2d 1035, writ refused; Venner v. Layton, Texas Civ. App., 244 S.W. 2d 852, ref., n.r.e.; Moore v. Horne, supra; Scott v. Townsend, supra; Olds v. Traylor, Texas Civ. App., 180 S.W. 2d 511, writ refused; Goodloe v. Goodloe, 47 Texas Civ. App., 493, 105 S.W. 533, writ refused.

I respectfully disagree with the majority in its effort to distinguish the case af Barksdale v. Dobbins, supra. The majority admits that the case is *"very like the case at bar."* (Emphasis added). The authorities recognize that no two cases are alike. Long v. Long, supra. While it is not necessary to show that the two cases are exactly alike, the cases are so strikingly similar, as I view them, that I feel it would be helpful to compare the facts in that case with the facts here. In that case the jury found that the will was procured through undue influence. The

trial court entered judgment on the verdict denying probate of the will. The appeal was upon the ground of "insufficiency of the evidence to support the jury finding."

(a) Testator had four children, one of whom was dead leaving children. Under the will involved in that case, the testator left his property to his three children and excluded his grandchildren. These facts are identical with the facts in the instant case;

(b) The testator was shown to have loved his grandchildren, just as in the instant case;

(c) Surviving children of testator were hostile to the grandchildren, as in instant case;

(d) His children had opportunity to influence testator as in the instant case;

(e) The children exhibited an ability to have their way with the testator, the same facts existing in this case;

(f) Testimony reflects surveillance of testator as there is testimony of some surveillance in the instant case;

(g) Testator's wife had died many years before him, just as in instant case, and the testator died at the same age, 93, in each case;

(h) Evidence showed that testator was "lean as a brier," above average in mind for his age, and bore reputation of being fair and honest. In the instant case, Mr. Pool is described as being "spry" above average in mind and for his age he "seemed right fair";

(i) Testator stated that he was going to leave his property to his children and grandchildren; in the instant case Mr. Pool always assured his grandchildren that they would be taken care of;

(j) Decedent could not drive his automobile; in the instant case decedent was restricted to three miles of his home in the country and the record is silent as to who carried him to Hamilton;

(k) The record is silent that either of the three children

ever discussed with the decedent that he make a will or suggested to him any of its terms; in the instant case evident shows Mrs. Boyer and Mrs. Blake discussed with Mr. Pool the making of a will;

(l) One of the children is shown to have a grasping nature; in the instant case the record shows actions of Mrs. Boyer and Mrs. Blake to be grasping in nature;

(m) Facts in the case show much stronger testamentary design and purpose of testator than facts in instant case which reflect no facts that Mr. Pool's will represented his own independent thinking;

(n) A number of statements showed that the testator could be influenced, while in the instant case we have statements showing that Mr. Pool could be and was influenced by Mrs. Boyer and Mrs. Blake; the will in question was kept a secret and Mrs. Blake and petitioners' attorney did not testify; undisputed testimony shows that for a number of years prior to his death Mr. Pool was totally dependent upon Mrs. Boyer and Mrs. Blake for his food and other social comforts, particularly after his son John died, and that the action of Mrs. Blake could and did distress and worry him;

(o) The Court affirmed the judgment of the trial court holding that the issue of undue influence was raised, and that it was sufficient to support the jury verdict of undue influence. No less can be said of the instant case.

The majority opinion puts emphasis on the fact that the testator offered an explanation for leaving out his grandchildren while in the Barksdale case the testator did not. I have answered this by pointing out that the evidence shows that the so-called debt did not exist. The claimed debt existed only in the minds of Mrs. Boyer and Mrs. Blake. The jury could not, in my opinion, have answered the special issue in the affirmative if it had believed Mr. Pool claimed a debt. The jury had the right to believe that the claimed debt was never in the mind of Jasper Pool. Since Mrs. Boyer and Mrs. Blake did not mention the matter of John's indebtedness until after John's death, and since Mrs. Boyer and Mrs. Blake were so familiar with their father's and John's affairs, and since the two had talked with their father in 1945 about his will, (which was before John Pool had returned to the home of his father,) and the will was executed

immediately after John's death, it would appear that his death removed the last obstacle to the execution of the will desired by the two daughters, petitioners here.

The trial court granted a motion for judgment non obstante veredicto in the present case. I contend that such action was erroneous. As this Court said in the case of Burt v. Lochausen, 151 Texas 289, 249 S.W. 2d 194: (a) In order "to sustain the action of the trial court in granting judgment non obstante veredicto, it must be determined that there is no evidence having probative force upon which the jury could have made the findings relied upon," and (b) "it was the jury's province to weigh all the evidence, to decide what credence should be given to the whole or to any part of the testimony of each witness." It is my considered opinion that the will involved in this case should not be admitted to probate.

The judgment of the Court of Civil Appeals should be affirmed.

Opinion delivered April 6, 1955.

Rehearing overruled July 27, 1955.