Ben BREWER et al., Appellants,

v.

Cecil FOREMAN et al., Appellees.

No. 14009.

Court of Civil Appeals of Texas.

Houston.

Nov. 15, 1962.

Rehearings Denied Dec. 6, 1962.

M. M. Williams, Houston, for appellants.

Schmidt, Garrett & Hensley, Max Garrett, Houston, for appellees.

COLEMAN, Justice.

Appellants, Ben Brewer and his wife, Ann Brewer, were the proponents of a will, which was admitted to probate by the Probate Court of Harris County, Texas, as the last will of Cornelia Foreman Culpepper. On appeal to the District Court of Harris County, Texas, after trial to a jury, probate was denied.

Issues were submitted to the jury on contestants' contentions that Mrs. Culpepper was not mentally competent to execute a will and that the will offered for probate was a result of undue influence exercised on Mrs. Culpepper by Ann Brewer. The jury was unable to agree on an answer to the issue on mental capacity, but did answer that the will was the result of undue influence. Judgment was entered on the partial verdict.

Appellants contend that there was no evidence to support the jury verdict. In considering this assignment we must accept as true all of the evidence tending to support the jury verdict. If the evidence is susceptible of different reasonable interpretations, we must adopt that interpretation most favorable to the verdict. Long v. Long, 133 Tex. 96, 125 S.W.2d 1034.

The will offered for probate was dated October 16, 1957, and by its terms leaves all of the property belonging to Mrs. Culpepper to Ann and Ben Brewer, except her bonds, money on hand and bank accounts, which were left to Betty Knight and Mrs. Bob Gilmer equally. None of the devisees were related to Mrs. Culpepper.

The contestants are Cecil Foreman, a brother, Madora F. Blount, a sister, Dora Lee Foreman, a niece, and Clarence Fisher, a nephew. At the time the will was executed Mrs. Culpepper was 77 years of age. There was no visiting back and forth and very little correspondence between Mrs.

Culpepper and her relatives, although Dora Lee Foreman, who lived in California, had visited with her and with Raiford Perritt, Dora Lee's half-brother, in 1955, 1956 and 1958. Mr. and Mrs. Perritt visited Mrs. Culpepper regularly. At a time near the date on which the will was executed, whether before or after is not shown, Mrs. Culpepper received a letter from her brother informing her of the death of her sister Nettie, and she called Cecil at his home in Doyline, Louisiana. There is no evidence of close attachment between Mrs. Culpepper and her relatives. Contestants introduced into evidence copies of instruments purporting to be wills executed by Mrs. Culpepper in 1929 and in 1950 by which all of her property was left to Mrs. Ellen Flemming Smith, who was not related to her, but was a lifelong friend, and had visited or talked with her almost daily for many years.

Mr. and Mrs. Brewer came to the city of Houston on October 19, 1956. Mr. Brewer was seeking work as a millwright. They rented an apartment for one week from Mrs. Culpepper. Mr. Brewer secured jobs through the union hall from time to time. When he had no work, he would often do maintenance work on Mrs. Culpepper's property. Mrs. Brewer began to clean the halls of the apartment house. When apartments became vacant, she would clean them so that they could be rented. After Mrs. Culpepper's maid quit, she did her apartment. Mrs. Brewer testified that she did not become a close friend of Mrs. Culpepper until the Spring of 1957 and not real close until April 19, 1957. Mrs. Brewer was a licensed beautician in Kentucky and she took care of Mrs. Culpepper's hair and performed other personal services for her. After a few months Mrs. Culpepper quit charging the Brewers rent for the apartment they used. There is little, if any, dispute about the facts set out above.

Other facts are disputed, but from the evidence the jury could reasonably have believed the matters next set out, some of which were strongly controverted.

Mrs. Culpepper was suffering from heart trouble, periodic vaginal bleeding, arteriosclerosis, high blood pressure, a tumor on her hip, kidney or bladder trouble, varicose veins, arthritis and rheumatism. She was an alcoholic and had some difficulty with her memory. She was vain and proud and craved attention and affection. She left her apartment only once or twice in five years. She took medication regularly, including codeine and digitalis, and complained of pain. She was able to walk around her apartment and her friends visited her regularly. She had parties on her birthdays and other occasions.

Prior to April, 1957, Mrs. Smith and some of testatrix's tenants ran errands for her, got her groceries, and did her banking. She had a maid to cook and clean her apartment. Her savings account was made to her or Mrs. Smith, as were some bonds she had purchased. Her papers and bonds were kept in a safe deposit box rented in both her name and that of Mrs. Smith.

After April, 1957, Mrs. Brewer cooked her meals, upholstered some of her furniture, and made slacks and shirts for her. She prepared the apartments and showed them to prospective tenants, but Mrs. Culpepper collected the rents and wrote or signed all checks. After the will in question was signed, Mrs. Culpepper asked Mrs. Smith to remove her name as cotenant of the safe deposit box and Mrs. Brewer's name was substituted.

In September and October, 1957, Mrs. Smith and Mr. and Mrs. Perritt noticed a change in the friendly relationship existing between them and Mrs. Culpepper. However, they continued to visit and call Mrs. Culpepper on the telephone. Mrs. Culpepper received numerous visitors in private, both before and after the will in question was executed.

While the testimony of the attorney who drew the will would be considered that of an interested witness, it is undisputed that his name was secured by Mrs. Culpepper from a list furnished her by her bank. He

came to her house at her request to consult with her about a will change. He prepared the will at his office in accordance with the instructions given him at that time and a day or two later returned to her home where the will was executed. Mrs. Culpepper requested two of her tenants to witness the will. There is no evidence that either Ben Brewer or Ann Brewer had discussed the will with the attorney or either of the witnesses prior to the execution of the will, and the lawyer testified that he had never seen nor talked to the Brewers until several months after the will was executed. The will was placed with the bank for safekeeping and, after Mrs. Culpepper's death, was delivered by the bank to the County Clerk. Mrs. Culpepper requested Mrs. Smith to get the old will out of the bank and bring it to her because she wanted to add a codicil to it and she told Mrs. Honish, one of the attesting witnesses, that she had made a small change in her will. After the will was executed she told Mr. Perritt that she had provided in her will that she be cremated although, in fact, she had signed a separate instrument so directing.

During the summer of 1957 Mrs. Brewer told Mrs. Culpepper that she was going back to Kentucky on a visit. The idea that the Brewers might return to Kentucky, where they had lived prior to coming to Houston, worried Mrs. Culpepper. Mrs. Brewer testified that Mrs. Culpepper told her that she would always have a home with her. In June, 1957, Mrs. Culpepper wrote an instrument in her own handwriting, apparently intended as a codicil to an existing will, reading: "6/4/57 While in my right mind, at my death am leaving property at 2905 Austin St. to Mrs. & Mr. Ben Brewer—other wise my *will* stands as is, my diamond ring to Mrs. Pearl Perritte. /s/ Mrs. Cornelia Culpeper. Witnesses /s/ Mrs. Josie Kelley /s/ Mrs. E. N. Burger." This instrument was given to Mrs. Brewer. The diamond ring was given to Mrs. Perritt before Mrs. Culpepper's death. After the will was executed in Oc-

tober, Mrs. Culpepper said nothing further to Mrs. Smith indicating concern that the Brewers would leave her. Mrs. Brewer knew that Mrs. Culpepper intended to make a will leaving everything to her. Neither Mrs. Brewer nor Mrs. Culpepper told the Perritts, Mrs. Smith, or the contestants that a new will had been executed.

Dr. Corbett treated Mrs. Culpepper from April 29, 1957, until her death. He was introduced to Mrs. Culpepper by Mrs. Brewer. The doctor testified that Mrs. Culpepper had a sound mind during October, 1957, and a number of lay witnesses testified concerning her mental capacity. There was testimony from which the jury could conclude that Mrs. Culpepper suffered from weaknesses of the mind and body caused by old age, disease, and the use of alcohol.

In the case of Long v. Long, supra, the Supreme Court of Texas announced certain general rules which govern cases of undue influence. It stated that no two cases are alike and each must depend largely on its own facts and circumstances. After giving several definitions of undue influence, the Court stated:

"2. It cannot be said that every influence exerted by one person over the mind of another is undue. The influence is not undue unless the free agency of the testator has been destroyed, and a will produced that such testator did not desire to make. 42 Tex.Jur., p. 793, sec. 4.

"3. In will cases, after mental capacity has been shown, the burden of proving undue influence is on the party contesting the probate of the will. Hart v. Hart, Tex.Civ.App., 110 S.W. 91.

"4. It is rarely possible to prove undue influence by what is generally known as direct testimony. Undue influence is usually a subtle thing, and by its very nature it usually involves an extended course of dealings and

circumstances. Usually a person charging undue influence must substantiate such charges by circumstances extending over a considerable length of time. It is therefore the settled rule that undue influence can be established by what is known as circumstantial, as well as direct, evidence. Besteiro v. Besteiro, Tex.Com.App., 65 S.W.2d 759; Bergstedt v. Bender, Tex.Com. App., 222 S.W. 547.

"5. Undue influence and mental incapacity are two distinct grounds for avoiding a will. Undue influence in its essential elements has no real relation to mental incapacity. Mental incapacity implies the lack of intelligent mental power; while undue influence implies within itself the existence of a mind of sufficient mental capacity to make a will, if not hindered by the dominant or overriding influence of another in such a way as to make the instrument speak the will of the person exercising undue influence, and not that of the testator. Scott v. Townsend, 106 Tex. 322, 166 S.W. 1138.

"6. In spite of the rule just announced, weakness of mind and body, whether produced by infirmities of age or by disease or otherwise, may be considered as a material circumstance in determining whether or not a person was in a condition to be susceptible to undue influence. 42 Tex.Jur., p. 796.

"7. A person of sufficient mental capacity to make a will has a right to devise his property as he may see fit, so long as he transgresses no law. Also, a person in making a will rests under no legal obligation to devise his property according to the laws of descent and distribution, or according to any moral law, and the mere fact that a testator has ignored such laws is no ground for setting aside his will. In spite of this, however, the fact that a testator has left a will that is unnatural

in its terms, and makes a difference between those who, according to natural law, ought to stand equal as to his bounty, may be considered as a circumstance along with other circumstances in determining whether or not the will was a product of undue influence."

We have here evidence from which the jury might have concluded that the Brewers had established a confidential relationship with Mrs. Culpepper and had the opportunity and a motive for undue influence; that Mrs. Culpepper was dependent on them in many respects. Possibly the jury might have concluded that the Brewers had a grasping attitude. These matters were considered by the Supreme Court of Texas in Boyer v. Pool, 154 Tex. 586, 280 S.W.2d 564, where the Court said:

"* * * The contestants established a confidential relationship, the opportunity, and a motive for undue influence and that during his last years the testator was virtually dependent upon his daughters, two of the principal beneficiaries. There is proof that the daughters made a daily charge for nursing their brother during his last illness, which indicates a grasping attitude by the daughters and a harsh and unnatural family relationship. Proof of this type simply sets the stage. Contestants must go forward and prove in some fashion that the will as written resulted from the daughters substituting their mind and will for that of the testator. Here the will and the circumstances raise suspicion, but it does not supply proof of the vital facts of undue influence—the substitution of a plan of testamentary disposition by another as the will of the testator.

*   *   *   *   *   *

"In fact it is not shown that any of the children had any knowledge that the will was being executed until afterwards. There is no evidence of the direct intervention of the will and mind

of the daughters or of the dominance of the free will of the testator in the preparation and execution of the will so as to bring this case within Long v. Long, 133 Tex. 96, 125 S.W.2d 1034. The fact that the testator in his will adopted the daughter's version of the debt question does not prove that he did not do so of his own free will. There is no proof raising a fact issue that the testator did not make a free decision. Proof that the daughters were favored and that the contestants got nothing under the will is not proof that the daughters did in fact substitute their mind and will for the mind and will of the testator. Since witnesses were available to establish the facts surrounding the preparation and planning of the will, we must hold that the contestants have failed to prove their case. Proof of the planning and preparation of the will, where the witnesses are available, is the heart of an undue influence case."

There is no evidence in this record that proponents had anything to do with the planning and preparation of this will. There is no evidence by any witness of any force, intimidation, duress, excessive importunity, fraud or other undue influence used or practiced by the proponents to overcome or subvert the will of the testatrix and induce the execution of the will.

While in a case where a testatrix is weak in mind and body, a less amount of intimidation or duress would be required to overcome her will than in the case of a healthy, strong-minded person, Taylor v. Taylor, Tex.Civ.App., 248 S.W.2d 820, in this case we find no evidence of fraud, duress, or intimidation.

■ The only testimony bearing on this point is the testimony of Ann Brewer that she told Mrs. Culpepper that she was thinking of returning to Kentucky on a visit. Mrs. Honish testified that Mrs. Culpepper told her that Mrs. Brewer was going to Kentucky to see her people. Mrs. Perritt testified that Mrs. Culpepper told her, "Oh, they are going to leave and I don't know what in the world I am going to do." She also testified that Mrs. Culpepper told her that the Brewers were going back to Kentucky to live, and that she was afraid Ann Brewer was going to go off and leave her. Mrs. Smith testified that Mrs. Culpepper told her, "Ann and Ben are going to leave and I don't know what I am going to do." She also testified that she did not hear Mrs. Culpepper say anything about the Brewers moving after October, 1957. The statements made by Mrs. Culpepper are obviously hearsay and are admissible only as evidence of her mental condition. Her declarations are not competent to prove the fact statements contained therein. Scott v. Townsend, 106 Tex. 322, 166 S.W. 1138; Burgess v. Sylvester, Tex.Civ.App., 177 S.W.2d 271, aff'd 143 Tex. 25, 182 S.W.2d 358.

The only inferences to be drawn from this testimony are that after Mrs. Brewer told Mrs. Culpepper she was going to Kentucky on a visit, Mrs. Culpepper began to be worried and afraid that she might not return.

■ Here we have an unnatural will in that the testatrix's relatives received none of her property. However, the force of this circumstance is weakened by the fact that there was no evidence of close family relationships, and by the fact that the two previous wills executed by the testatrix made no bequests to any of her relatives. In Curry v. Curry, 153 Tex. 421, 270 S.W. 2d 208, the Supreme Court of Texas said:

"The deed made an unnatural disposition of the property only in the sense that one child was preferred over the others. This circumstance is frequently present in cases involving the issue of undue influence, but those in which it appears to have been given weight by the courts involved the absence of a reasonable basis for the preference and the presence of other strong probative circumstances."

Here we have no evidence connecting the Brewers with the details necessary to the preparation and execution of the will. The presence of such a connection was considered highly significant in Long v. Long, supra, and the absence of such a connection was noted as significant in Burgess v. Sylvester, supra, and Boyer v. Pool, supra.

Considering the evidence in this case most strongly in favor of the contestants, we find circumstances which warrant the inference that the companionship and services of proponents were so agreeable to the testatrix that she executed the will in order to bind proponents to her and insure the continuation of such services. While the activities of Mrs. Brewer might have influenced Mrs. Culpepper to make the will in question, we cannot characterize such influence as "undue". Curry v. Curry, supra. "Wills executed through love, kindness, and gratitude are not caused by undue influence in the eyes of the law." Smith v. Mann, 296 S.W. 613, Tex.Civ.App., writ ref.

"The rule has been well established that the issue of undue influence is not raised unless the record contains some evidence of probative force that such influence was exercised, and that it subverted and overpowered the will of testator and caused the execution by him of a will which he would not have executed but for such influences." Black v. Black, Tex.Civ.App., 240 S.W.2d 458.

The facts of this case suggest the quotation from Sloan v. Maxwell, 3 N.J.Eq. 563, found in McCannon v. McCannon, 2 S.W.2d 942, Tex.Civ.App., writ dism., reading: "The power of disposing of property is an inestimable privilege of the old. It frequently commands attention and respect when other motives have ceased to influence. How often, without it, would the hoary head be neglected, deserted, and despised." ·

A question of fact was clearly raised by the evidence on the issue of testamentary capacity. Appellants' point that there is no evidence to raise this issue cannot be sustained. Appellants contend that since the will was self proving as authorized by the Probate Code, the rule found in Leyva v. Pacheco, Tex.Civ.App., 352 S.W.2d 898, reversed Tex., 358 S.W.2d 547, requiring clear and unmistakable evidence to overcome the effect of a certificate of acknowledgment of a deed, should be applicable in this case. A will executed by one not of sound mind is invalid by reason of lack of testamentary capacity. Sec. 57, Vernon's Ann.Probate Code. If the will is self proved as authorized by the Code, testimony showing that the testator was of sound mind at the time the will was executed is not required. Sec. 88, Vernon's Ann.Probate Code. The effect of this provision of the Code is to place the burden of proof on this issue on the contestants. We think no further change in the prior law was intended by the provisions of the Code authorizing self proving wills.

Sec. 10, Vernon's Ann.Probate Code, provides that any person interested in an estate may, before any issue in any proceeding is decided by the court, file opposition thereto in writing and shall be entitled to be heard as in other suits. Sec. 93, Ibid., provides that after a will has been admitted to probate any interested person may institute suit to contest the validity thereof. Appellants contend that contestants have no interest in this estate. In the absence of a valid will, contestants would inherit as heirs of Mrs. Culpepper. Appellants assume the validity of the prior wills introduced into evidence, a matter not established by the evidence. The point is overruled.

Appellants complain of the actions of the trial court in admitting evidence that testatrix used alcohol. While this testimony might have had a prejudicial effect on appellants' case, it was admissible both on

the issue of testamentary capacity and that of undue influence.

Appellants have presented other points pertaining to testimony admitted by the court over their objection. These points have not been properly briefed and will not be considered.

■ Appellants have presented a group of points relating to the argument of counsel for appellees. The argument was not reported by the official court reporter and counsel for the parties were unable to agree on a transcript thereof. Bystander bills were prepared but they were not prepared in accordance with Rule 372, Texas Rules of Civil Procedure. These points, therefore, present no error. In any event, a consideration of the controverting affidavits leads us to find that no error is presented by these points.

All other Points presented by appellants have been carefully considered and are overruled.

The judgment of the trial court is reversed and this case is remanded for new trial.