## THOMPSON v. TOWNSEND et al.
### No. 9950.

Court of Civil Appeals of Texas. Austin.
April 11, 1951.

Rehearing Denied May 2, 1951.

W. A. Johnson and Sedberry & Williams, all of San Angelo, for appellant.

W. S. Leslie, Francis G. Culhane, all of San Angelo, for appellees.

ARCHER, Chief Justice.

This is a will contest.

Mack Dee Townsend executed a will on December 20, 1946, in Austin, Texas, with the formalities of law, and bequeathed all of his property to his wife, Mrs. Stella Townsend. Mr. Townsend died in San Angelo, Texas, where he then resided, on February 9, 1948. The will with application to probate it was filed by Mrs. Townsend, who was named independent executrix, on July 29, 1948, and a contest was filed by H. M. Townsend and Wanda Marie Dollar et vir., children of Mack Dee Town-send by a former marriage, on August 7, 1948. The will was duly probated in the County Court of Tom Green County, Texas, on December 7, 1949.

The contestants duly appealed to the 119th Disrtict Court and trial was had to a jury, and in answer to the only issue submitted the jury found that the execution of the will was procured by undue influence on the part of Stella Townsend, and subsequently a judgment was entered by the court denying the probate of the will and setting the order of the County Court probating the will aside.

The appeal is before us on four points assigned as error: the first was to the effect that there was no evidence from which the jury could infer that the will was the result of undue influence; and the second that the trial court should have granted appellant's motion for judgment, notwithstanding the jury verdict, because of lack of evidence from which the jury could legally infer that the will was the result of undue influence; and, third, that the evidence was insufficient to sustain the verdict of the jury; and, fourth, that it was error of the court in failing to sustain appellant's special exception to the allegation in the amended pleading that Stella Townsend did keep Mack Dee Townsend in fear, and did by such plans and schemes cause such will to be made.

The contestants pleaded that: "Said will was not the last will of testator; that if said will was executed by testator, it had been revoked by another will; that if testator executed the will, he did so because he was unduly influenced to do so by the 'compulsion, argument and fraud' on the part of his then wife, Stella Townsend (now Stella Thompson), by one or more of the following methods or schemes: (1) that she did influence testator to make said will in a desire for peace and quiet and in order to get along with her; (2) that she made life so unpleasant for his children that they had to stay away from home, and created the illusion in testator's mind that they were voluntarily staying away; (3) that she was over-bearing and dominating as to testator, and he being quiet and peaceable, she unduly dominated and ruled

every act of his, and he was at all times afraid to oppose her will; (4) that by such domination and keeping his children away from home, she caused testator, in a desire for peace and quiet, to make and execute such will; (5) that she planned and schemed from the beginning to keep his children away from home and leave the impression on the testator that they were voluntarily staying away, and represented to her husband that she would give such property as they had to his children; that she would not permit visits by and conversations with his children outside of her presence during the last year of his life; and that she made a scheme to engage in such conduct before her marriage to testator; and that if testator did make such will, he did so because of the long-continued and over-bearing domination of her, the said Stella Townsend, and, for peace of mind and to be free from worry and nagging and continuous importunities of her, and because of the false impression she created in his mind concerning his children; and that she concealed from contestants all of the facts relative to the affairs of testator."

The court submitted the following issue:

"1. From a preponderance of the evidence do you find that the making and execution of the instrument which was signed by Mack Dee Townsend on December 20, 1946, and which is sought to be probated here as his last will and testament was procured by undue influence on the part of Stella Townsend? Answer Yes or No." Answer: "Yes."

" 'Undue influence' is any fraudulent or designing means employed upon and with the maker of a will by which under the circumstances and conditions by which such maker was surrounded he could not well resist, and which control his volition and induced him to do that which otherwise he would not have done."

The jury having answered the issue "Yes", the court entered its judgment denying the probate of the will.

Many witnesses testified; the attorney who drew the will and became a witness to the will as well as the other attesting witness testified by deposition. The attorney testified that he had known Townsend for a number of years, and that Townsend came to his office alone and after the will was prepared the testator signed it in the presence of the witnesses; that Stella Townsend was not present when the will was discussed with testator, or when signed; that testator appeared to know what he was doing.

Mrs. L. C. Johnson, the mother of contestants and former wife of Mack Dee Townsend, from whom a divorce had been obtained in 1936, testified concerning her marriage and of the actions and conduct of Mrs. Thompson, then Mrs. Piland, with Mr. Townsend, and of Wanda's condition, and of a property settlement, in which Mr. Townsend got the most. The parties owned a place in Hays County and the sale was for $500 cash, a note for $500, payable to M. D. Townsend, and the assumption of an indebtedness of $1839.67.

Henry Townsend testified as to conversation with appellant after Mr. Townsend's death, in which the appellant said that the will was in Austin, and that everything was left to her until her death, and then to be equally divided among the children; that he never saw the will until it was filed for probate.

Mrs. Sue Martin testified that she kept Wanda, at Mr. Townsend's request; that Mr. Townsend told her that his wife did not like Wanda, that he paid for things for Wanda; that Mrs. Townsend said that Wanda was not worthy of a coat; that Mr. Townsend came to see Wanda and was fond of her.

D. D. Wallis, an uncle of Henry and Wanda and a brother-in-law of Mack Dee Townsend, his wife being Townsend's sister, testified that he knew Townsend for 30 years and the two children all of their lives; and also knew Stella Townsend, and Mrs. Johnson, mother of Henry and Wanda; that Mack Dee Townsend was fond of his children; that when Mr. Townsend was in the hospital in Austin in 1945 he said he would like to see Henry; and told of an incident when Mrs. Townsend wanted to get the doctor to sign some papers so her son by a former marriage could get

an extension of leave; that the doctor said no, that he thought that it was Dee's son who wanted the papers signed; that Dee was in the hospital about three months; that an X-ray picture showed that Dee had spots that spread over his lungs; that on a later date he helped Dee work on a well, that Dee, said he was not able to work, but that Stella said it had to be done and later told of some cabinet work in the kitchen that did not suit Stella and he had to tear it out, that his wife told him to do it. The witness thought from his observations of Stella that she was a domineering, overbearing person. He testified that on a later occasion Dee said, "I don't see why I signed them papers for anyway; I didn't want to do it." That when Mr. Townsend was sick the witness asked Mrs. Townsend if she had written Wanda, who was in Fort Worth, or sent her word, and she said, "I don't care whether she ever comes or not"; that Mr. Townsend said he wanted to see Henry and to get him quick; that Stella gave Dee medicine; that Henry came but Stella would not leave them alone.

Pat Wright, a nephew by marriage of Mack Dee Townsend, testified that Dee was fond of his children; that on an occasion he heard Stella say that they had definitely made out their will, and that the two children were in it and that her two children were not in it; and that Uncle Dee told him, "I am making another will."

Mrs. J. E. Wright, a cousin of contestants, testified that Dee was fond of his children and that she heard Stella say that there were five people in the will, and heard Dee say that the will had five people in it; that Stella seemed like she did not want the stepchildren there.

Mrs. D. D. Wallis, a sister of Dee, testified that Dee was crazy about his kids; that Stella did not show much affection for the children; that she heard Stella say that they beat her out of her first husband's insurance, that they wouldn't do it again; that Dee and Stella married the same day the divorce was granted; that Stella got the insurance check on Dee's life for $2,250.

Mrs. Lillian Townsend, wife of Henry, testified concerning a visit with Wanda to see Dee and Stella, and that Stella told them that Wanda had gone to her mother and that she had made her bed and could lie in it, and that she wasn't coming in her house any more, and did not let Wanda see her Daddy; that when Dee was ill there was one instance that Stella fussed at him until he got up; and that she heard Stella say that a will had been made out to her until her death and then divided among the four children.

J. C. Townsend, a brother of Dee, testified that Dee and Elsie had a little ranch; that ranch was sold after the divorce and Dee brought the proceeds to San Angelo and bought property; that Wanda and Henry came to San Angelo with their father; that Dee loved his children; that Dee told him that he had to let Stella have her way to get along with her; and of an occasion when Dee and Stella were moving back to San Angelo, that Stella told Dee they were not going to haul that mess off, and that there was a sweat shirt among the things, and Dee picked it up and cried, saying, "Jim, there's a shirt I will need in that cold country—I can't have anything." He testified as to Dee building some kitchen cabinets, and that Stella made him tear them out and put them in her way; and further as to the divorce and sale of the ranch.

Wanda Dollar testified concerning the divorce between her parents, and that she was living with her Daddy when he married Stella, and that subsequently she and Henry lived with Dee and Stella until February 1938, when she went to her mother; and testified as to her relationship with Stella and of instances between them concerning a ring, some dessert, and as to slappings; that she told Stella she was going to leave, and Stella said, "I don't care, and I hope you do"; and of a letter from her mother, and of reading it and that Stella took it away; and of writing to her mother and that her mother came and got her; and that at a later date she and Lillian went to Dee's house and Stella would not let them in, and that she told her she belonged in a reformatory and was just like her mean mother; that Stella was mad; that she went to see her father at the filling station

and that he was glad to see her; that subsequently she returned to her father who took her to Jimmy and Sue Holloway to stay with; that her father told her that Stella said, "I had left and could not come back."

Mrs. Howard Bailey, daughter of Mrs. Townsend, testified as to the sale and purchase of real estate and as to profits; that her mother and stepfather got along well; of the time Dee was in the hospital in Austin.

Mrs. C. E. Wells testified that she had known Dee and Stella about six years, that they were friends; that Dee and Stella got along fine.

Mrs. Stella Thompson, formerly Townsend, testified concerning her association with Wanda and of particular incidents, and that she whipped Wanda one time because she found her looking through a dresser drawer; that she did not refuse to let Wanda come in the house; that she loved the children; that she never mentioned the will to any one of the parties who had testified; that she sold Henry a truck before the will was filed; that at no time did she discuss the provisions of the will with Henry.

Charlie Gilmore testified that he knew Mr. and Mrs. Townsend and that they got along like a man and wife should get along; that Dee appeared fond of his children and loved them.

Mrs. Howard Nard testified that she was acquainted with Mr. and Mrs. Townsend, and had known them for about 11 years, during which time she saw them often and they were very congenial to one another; that Mrs. Townsend took good care of the house and of Dee's needs.

Mrs. Charlie Gilmore testified that she had known the Townsends since 1943, and lived next door to them and saw them many times; that they were a perfect couple, that they never fussed or quarreled with each other.

Mrs. Lee Hasty testified that she had known the Townsends four months; that Mrs. Townsend was very attentive, kind and good to Mr. Townsend.

A. J. Caldwell testified that he had known the Townsends since 1943, and that they had a peaceable, congenial home.

Dr. Eckhardt testified as to treatment he ordered for Dee and medicine prescribed.

We are unable to determine what papers Dee had in mind when he said to D. D. Wallis, according to Wallis' testimony, "I don't see why I signed them papers for anyway; I didn't want to do it." If he had reference to the will, then he had an opportunity to have revoked the will had he cared to so do.

It is noticeable that the testimony largely concerned the attitude of Mrs. Townsend toward the stepchildren, and there was not presented such testimony as would indicate any domination of appellant over her husband with relation to the making of this will. The testimony of the contestants was as to matters which they claimed tended to show the general domination they relied on.

A portion of the testimony of the witnesses is that concerning the acts and statements of Mr. Townsend subsequent to the execution of the will on December 20, 1946, and could have no bearing on the issue of undue influence by Mrs. Townsend in procurement of the will. The testimony as a whole is not sufficient to meet the kind of control the law requires to overturn a legally executed will. Mr. and Mrs. Townsend had been married for over 10 years, and had bought and sold property with some degree of success. The value of the estate has not been determined, but it was estimated to have a value of $4,250 in the application to probate the will.

We do not see any unusual action when a husband bequeaths to his wife his share of an estate not of great value and when taken in consideration with the fact that his children were both grown and married.

In Pierson v. Pierson, Tex.Civ.App., 57 S.W.2d 633, 636, the court held: "Whatever the refinements it may have otherwise gone through, the phrase 'undue influence' has acquired in our jurisprudence, as applicable to the simple question here involved, a well defined legal meaning in these two respects: First, as to what it is;

second, as to the quantum of proof required to establish it.

"Under the first of these, it has thus been acceptably defined: 'To be classed as undue, influence must place the testator in the attitude of saying: "It is not my will, but I must do it." He must act under such coercion, compulsion or constraint, that his own free agency is destroyed.' * * *

"Under the second, it has been quite generally held as follows: 'Undue influence cannot be presumed or inferred from opportunity or interest, but must be proved to have been exercised, and exercised in relation to the will itself, and not merely to other transactions.'"

■ Undue influence has been defined as "that which compels the testator to do that which is against his will from fear, the desire of peace, or some feeling which he is unable to resist." 42 Tex.Jur., p. 792, Sec. 2.

In Long v. Long, 1939, 133 Tex. 96, 125 S.W.2d 1034, 1036, it is stated: "It is rarely possible to prove undue influence by what is generally known as direct testimony. Undue influence is usually a subtle thing, and by its very nature it usually involves an extended course of dealings and circumstances. Usually a person charging undue influence must substantiate such charges by circumstances extending over a considerable length of time. It is therefore the settled rule that undue influence can be established by what is known as circumstantial, as well as direct, evidence. Besteiro v. Besteiro, Tex.Com.App., 65 S.W.2d 759; Bergstedt v. Bender, Tex.Com.App., 222 S.W. 547."

In Rounds v. Coleman, Tex.Civ.App., 214 S.W. 496, 497, it was stated: "* * * it was not necessary to show that the overt acts of undue influence, if any, were exercised at the time of the execution of the will, but that it was sufficient that such influence, if any, had been exercised previously and operated at the time the will was executed."

■ We do not believe that the evidence, which we have tried to summarize, was sufficient to meet the standards of testimony and admissibility in cases of undue influence, and was not sufficient to justify the submission of the issue to the jury. Bass v. Bass, Tex.Civ.App., 207 S.W.2d 103, Writ Ref.N.R.E.; May v. Brown, 144 Tex. 350, 190 S.W.2d 715, 165 A.L.R. 1180.

The judgment of the trial court is reversed and the cause here rendered for appellant.

Reversed and rendered.