Katie B. MASON, Individually and as Independent Executrix and Trustee of the Estate of Dr. H. B. Mason, Deceased, Appellant,

v.

H. B. MASON, Jr., Appellee.

No. 10964.

Court of Civil Appeals of Texas.

Austin.

July 10, 1963.

Rehearing Denied Aug. 1, 1963.

Cox, Brown & Daniel, Temple, for appellant.

Richey, Sheehy, Teeling & Cureton, Waco, Taylor & Taylor, Temple, for appellee.

HUGHES, Justice.

This is a will contest in which the jury trying the case found that at the time Dr. H. B. Mason executed the instrument in question (will), he was acting under the undue influence of his then wife, Mrs. Katie B. Mason. No other issue was submitted to the jury, and no complaint is made that any other ground for invalidating the will was raised by the evidence.

It is our opinion that there is no evidence to sustain or support the finding of the jury.

The only parties to this suit are the contestant, H. B. Mason, Jr., and contestee, Mrs. Katie B. Mason, widow of Dr. Mason, beneficiary under and independent executrix and trustee of his will.[1]

Dr. Mason died in Temple, Texas, on March 19, 1957, at the age of 72 years. Dr. Mason was twice married. His first wife died at the birth of their only child, Hubert Jr., appellee, about the year 1919. Dr. Mason married Katie Mason, formerly Mrs. Katie Ozier, in 1935. Mrs. Katie Mason had one son who is now Dr. Billie Burton Ozier. He and his wife, Margery, have three children, Michael, Gary and Mark, the latter being born after Dr. Mason's death.

Hubert Mason, Jr. is married to the former Rose Hall, daughter of former Chief Justice Reuben Hall of the Texarkana Court of Civil Appeals. Mr. and Mrs. Hubert Mason, Jr. have one child, Richard Gregg Mason, the grandson of testator.

The will of Dr. Mason was dated and executed February 14, 1957. The will was drawn by W. R. Brown, a Temple attorney, who also acted as Notary Public in taking the acknowledgment of and administering the oath of the testator and witnesses to the will. The will was witnessed by Charles William Brown, an attorney and Mildred R. Knight, an employee of the law firm of Cox, Brown and Daniel.

Mr. W. R. Brown, who was 67 years of age at the time of trial, testified that he had known Dr. Mason practically all of his, Mr. Brown's, life, that he knew him socially and had done a "considerable part" of his legal work for many years. He and Dr. Mason officed in the same building. In 1941, Mr. Brown persuaded Dr. Mason to become a candidate for a place on the Temple City Council. Dr. Mason was elected, and became Mayor of Temple.

Dr. Mason suffered from hypertension or high blood pressure. In 1953 he had what laymen call a slight stroke. He had some numbness in the right side and a slight slurring in his speech. As a result of this temporary impairment, Dr. Mason worked less and did less surgery. He, however, made a complete recovery from this illness.

Dr. Mason also suffered from a prostate condition, and shortly before his death he had a slight attack of phlebitis in his right leg. In February 1956, Dr. Mason consulted Dr. J. G. Rogarde, a member of the medical staff of Scott and White Hospital at Temple and its Chief of Staff for a number of years and also President of the State Board of Medical Examiners, regarding an abdominal pain. An enlarged prostate was noted. Dr. Mason and Dr. Rogarde were close friends and Dr. Rogarde saw him from time to time. On February 13, 1957, Dr. Mason went to see Dr. Rogarde and as a result of the examination then made of Dr. Mason and consultation with another physician surgery was recommended for the prostate condition. This surgery was recommended only upon the finding by Dr. Rogarde that Dr. Mason was in good general physical condition. Dr.

---

1. See Mason v. Mason, 366 S.W.2d 552, Tex. Supreme Court.

Mason entered the hospital for surgery on February 14, 1957. The operation was performed the next day. Dr. Mason's death at 11:30 a. m. on March 17, 1957, was sudden. Dr. Rogarde saw him at 8:15 a. m. and he was "doing very well, having no complications. * * * was happy and reading his mail."

Mr. W. R. Brown testified that Dr. Mason consulted with him about 11 a. m. on the day he went to the hospital. He did not recall whether or not Dr. Mason had made an appointment with him. Usually, he did not. We quote from the testimony of Mr. Brown:

"A. It is my recollection that Mrs. Mason came with him and they told me, one or the other, that he was going to the hospital at three o'clock that afternoon, and that he wanted a will drawn and wanted it executed before he went to the hospital.

"Q. Were you having your discussion with Dr. Mason or Mrs. Mason?

"A. I think primarily with Dr. Mason.

"Q. What instructions did he give you regarding the will?

"A. First I asked what disposal of his property he wanted to make, and I had assumed and was under the impression that Hubert owned half interest in what we called the community center property, Third and French, and I asked him what he wanted to do with that property. My recollection is that Mrs. Mason turned to him and said, 'Doctor, I think you ought to give that property to Hubert,' and he said, 'No, if I did he would not have it long.' Then I explained the life estate possibility. * * *

"Q. Did Dr. Mason specifically instruct you to put that type of restriction on that property?

"A. He did. I explained it to him, if that was what he was afraid of, he could handle it that way and he instructed me to do so. * * *

"A. Well, after I got the instructions as to how to draw it with respect to the community center, then I asked about the family homestead and so forth.

"Q. What did he want to do?

"A. My recollection is he wanted to give Katie a life estate. I did not know whether it was his separate property or community, and he wanted to give her the contents, the household goods and so forth, and the family automobile or automobiles. I believe there were two at the time. I had previously explained to him the problem of the marital deduction as far as estate taxes were concerned. * * *

"Q. Was Dr. Mason interested in minimizing the federal estate tax?

"A. Well, I have been after him for some years, knew his estate was approaching a good size estate, and I think I was instrumental in causing him to make the gift of the building near the Telegram to Hubert to get that out of the estate. I have talked to him several times, wrote him a note, reminding him that inflation was here and the estate would be liable for a rather heavy federal estate tax. * * *

"Q. Did Mrs. Mason say anything else at that conference other than what you testified earlier?

"A. I have a faint recollection, I think she told him that her grandchildren ought not to share in the remainder in the community center.

"Q. What did Dr. Mason say?

"A. He shook his head and said he wanted to leave it like it was originally framed in my notes."

Mr. Brown took notes as to how the will should be drawn. His conference with Dr. and Mrs. Mason ended about a quarter to twelve. Mr. Brown shortly thereafter dictated the will to his secretary Mildred R. Knight. Dr. and Mrs. Mason returned to Mr. Brown's office about 2:30 p. m., and we quote again from Mr. Brown's testimony:

"Q. At the time he came back did you go over the will with him?

"A. Yes.

"Q. Did you explain it?

"A. I explained it paragraph by paragraph.

"Q. Did he voice any objection or have any changes that he wanted?

"A. He had no objection and no suggestion.

"Q. Did Mrs. Mason say anything at the time that the will was being explained to him?

"A. Only the two statements that I mentioned.

"Q. I am referring to the time after he came back.

"A. My recollection is that no statement was made by her at all.
    * * *

"Q. * * * Will you state whether or not this will that is here in evidence, as it was typed up, and as it was finally signed and witnessed and notarized and so forth, if that represented the wishes and desires of Dr. Mason as he had conveyed them to you?

"A. It did."

The principal provisions of the will of Dr. Mason are substantially, as follows:

To H. B. Mason, Jr., for life, a one half interest in property located at French Avenue & Third Street, in Temple. The other one half interest in this property was inherited by Mr. Mason from his mother. It was rented for about $500.00 per month. The remainder of testator's one half interest in this property was devised to his grandson and the two children of Dr. Ozier, per stirpes.

To Katie B. Mason, in fee simple, the family homestead; also its contents and family automobile.

To Katie B. Mason a one half interest, in fee simple in any separate property testator might have, not otherwise specifically devised.

To Katie B. Mason a life estate in all property not otherwise specifically devised.

Upon the death of Katie B. Mason, all property not specifically devised was given, devised and bequeathed to the Temple National Bank, in trust, one half for the use and benefit of testator's grandson, and one half for the use and benefit of the two children of Dr. Ozier living at the time of testator's death.

For estate tax purposes, the value of the estate passing to Katie B. Mason was appraised at $131,344.19; to H. B. Mason Jr., $12,785.25; to Richard Gregg Mason (grandson) $74,396.24; to each of Dr. Ozier's children $37,198.12.

Dr. H. B. Mason was an eminent physician. He was a humanitarian. He was charitable. He was generous. He was very devoted to his son, the son of his wife, his grandson and the children of his wife's son. With it all, however, Dr. Mason was a hard headed and very successful business man. He worked for and earned all of the estate he left, and he respected its value. He was very proud, and rightly so, of his accomplishments.

H. B. Mason Jr., is now a minister. He took pre-medical training at the University of Texas, but he did not pursue it. He tried his hand at numerous vocations; he was at various times, but not for very extended periods, a house to house salesman, worked in an unemployment office, for a newspaper, as a roustabout for an oil company and in an oil company office. He worked some on his father's stock farms. He was in the Army for more than five years. As a young man, Mr. Mason had ambitions to be a writer and an actor.

Dr. Mason expressed dissatisfaction with his son's inability to handle money. In 1946, he borrowed $2500.00 from his father to go in the baby furniture manufacturing business. He did not go in the business and he did not return the money.

Dr. Mason was extremely generous with his son. He gave him a building in Temple about the time he was married. This building is rented for $230.00 a month. Dr. Mason also sold a building and divided the proceeds, $15,000.00 equally between his son and his wife's son. He gave his son numerous cars and other gratuities. He left him $10,000.00 in life insurance. He bought an educational policy for his son (grandson).

Dr. Rogarde testified to the following conversation with Dr. Mason:

"Q. What did he tell you about Hubert?

"A. His main preoccupation about Hubert was he had never been able to settle down, had tried to give him everything he could, and had tried to send him to school, and he did not take advantage of that, had helped him financially—that Hubert seemed to run through with everything he gave him, and could not settle down to anything in particular and that sometimes for weeks and months he would not hear from him and did not know where Hubert was.

And one time in particular he worried about him a lot, that Hubert was trying to convert or salvage souls, particularly alcoholics and other people that needed help, and he was concerned about what might happen to his wife and child, because Hubert was out nights looking for these poor victims—and that his house was open for anybody who wanted shelter and that he wanted Dr. Mason to help him buy a place that he could convert into that type of place.

"Q. That he wanted him to send him money for it?

"A. I don't recall he wanted him to give him money. Dr. Mason worried that if he had that kind of place, it was not a proper place to bring up the child and for his wife to be there with all those derelics, and that was his main concern.

\* \* \* \* \* \*

"A. Another time he told me that everything he had given Hubert he had disposed of or run through, he would not take care of it, that he was going to see to it that in the future what he would give Hubert was going to be in such a manner that he could collect the rents, or get something out of it—the only way he could protect Hubert, giving him a certain amount of income every month instead of the gross amount, that he would dispose of it, like he had everything else he had given him."

Dr. Mason was characterized by many close and long time friends as a strong willed and very determined man. This characteristic remained with him all his life. Those who testified to this trait were: Mrs. Elizabeth Bosl, a witness for appellee, who was a graduate registered

nurse employed by Dr. Mason for 17 years; W. R. Brown; Frank A. Thompson, Manager of the Scott and White Clinic at Temple (50 years close acquaintance); H. F. Blum, President of the Federal Savings and Loan, Temple (50 years close acquaintance); Mrs. Frank A. Thompson; Dr. Frank A. Robinson (more than 50 years close acquaintance); Dr. W. B. McCall (28 years as good friends); Dr. J. G. Rogarde (acquainted since 1935, very close since 1950); Mr. Gene Mewhinney, Vice President of the First National Bank in Holland (30 years).

Mrs. Bosl testified that in the fall of 1956 Dr. Mason received notice from an insurance company that his son had applied for a sum of life insurance, regarding which she testified:

"Q. Now just what came up between you and Dr. Mason or what conversation did you have with the doctor at that time?

"A. The doctor gave me a letter to read from the insurance company, and I thought nothing of it. He said, well, he did not want Hubert to do that, because 'Hubert is taken care of and he will never have to worry about a thing.'

"Q. What are the facts with reference to whether the doctor said he was going to write him a letter?

"A. He said he was going to write him a letter."

Dr. Mason did write his son a letter concerning this insurance, which we quote:

"Dear Son:

"In the mail this morning I had a request from your friend Ray Toussant with a blank for insurance, and asking a lot of questions. Now you can do as you like about this but I have $15,000.00 insurance paid up for you; there is about $150,000.00 in Texas Company,

Sinclair, Humble, Sears Roebuck and United States Steel Stock that is paid up and will eventually be yours besides most of the real estate in West Texas and here. Your old insurance will cost you a lot at age 43 so think it over.

"Didnt Texas do herself proud Saturday?

"I am getting four Cotton Bowl Tickets any way on a gamble.

Let me know.
    "Love,
    "Pappy.  (In ink) HBM
. . . . . . . . . . . . . .

"Envelope.  Via Air Mail.  To Hubert B. Mason Jr., Muscatine, Iowa. Postmarked, Temple, Oct. 15, 1956."

On cross examination, Mrs. Bosl testified:

"Q. And that at that time he was upset and did not think Hubert should take out that life insurance?

"A. Yes, that is what—

"Q. At that time did Dr. Mason tell you any reason why he thought it would not be good for Hubert to have that life insurance?

"A. Yes.  He made a statement.

"Q. What was that statement?

"A. That he was afraid that perhaps Hubert had suicide in mind or something."

On re-direct examination by appellee, Mrs. Bosl testified:

"Q. Mrs. Bosl, Mr. Brown asked you something about the doctor in one of your conversations saying he was afraid Hubert had suicide in mind when he got the letter about the insurance policy.  Did he say where he got the idea or what caused him to have that belief, that possibility?

"A. To the best of my recollection it was that there was something like that in the background of the family.

"Q. Some kinsman somewhere back there had committed suicide?

"A. Yes."

On February 14, 1957, the morning Dr. Mason conferred with Mr. Brown about drawing his will, Dr. Mason saw five or six patients in his office. He was working as usual. Mrs. Bosl gave this testimony regarding a telephone call she received that morning:

"Q. Back to the last morning Dr. Mason was in his office, the morning of February 14, 1957. During that morning, did you or did you not answer the telephone for Dr. Mason?

"A. Yes, I did.

"Q. Did you receive a call for Dr. Mason from Mr. Brown, the attorney, from his office?

"A. Yes.

"Q. Was that office in the same building, the Temple National Bank Building?

"A. Yes.

"Q. What was the nature of that call?

"A. They asked that the doctor come up to their office, that they were ready for him.

"Q. Asked the doctor to come to Mr. Brown's office, that they were ready for him?

"A. Yes.

"Q. Did you relay that message to Dr. Mason?

"A. Yes, I did.

"Q. What was his response?

"A. He said, 'I am not going to do it,' and 'I am not going up.'"

After the conference about the will, Dr. Mason went home to lunch. His brother, Robert Mason, and his sister, Mrs. H. W. Barton, were present. Mrs. Barton testified:

"Q. Did you see your brother Dr. H. B. Mason at that time?

"A. Yes. He was sitting at the table.

"Q. Did you notice anything out of the ordinary or strange about him, the way he acted at the time you saw him?

"A. Well, he acted in a most abnormal way. He looked at me in a puzzled manner, just puzzled. I could not understand it.

"Q. Did he talk to you?

"A. Very little. He spoke, but talked very little.

"Q. Tell us whether he was a very sociable, talkative man?

"A. He certainly was.

"Q. Since this seems to have made an impression on you,—was he seated at the table?

"A. Yes, and only toying with his food. He wasn't eating."

Mrs. Barton also testified to the following incident:

"Q. Do you recall an incident when your husband and Dr. Mason were in another part of the house of Mrs. Katie B. Mason making a statement to you?

"A. I do.

"Q. Will you tell the jury what she said?

"A. Mrs. Katie B. Mason told me she wanted to tell me something, and this something was did I know that Hubert Jr. had sold his son's educational policy and spent the money and I said that was pretty

hard for me to believe, and I worried about it for months."

With regard to this incident, Mrs. Bosl testified that early in 1957, Dr. Mason told her that he had heard that his son had cashed the educational policy for the grandson, and that he was very upset. She testified that Dr. Mason checked with the insurance agent and learned "that the policy was intact, that it had not been cashed."

With reference to this same incident, Mr. Robert Mason, Dr. Mason's brother, testified:

"Q. Do you remember an incident that happened with reference to an educational policy that Dr. Mason had purchased for his grandson, Dick, do you recall the instance when he said something about that to you?

"A. Yes, I do.

"Q. With reference to the time he went to the hospital the 14th of February, when did that happen?

"A. Getting pretty close to that, would say a week or ten days before he went to the hospital.

"Q. Can you tell what he said?

"A. Yes. I can. I remember that. We were sitting in the car, and he says, 'What do you think of Hubert?' I said, 'What do you mean?' He says, 'Well, he cashed that policy I took out for Dick's education.' I said, 'Doc, I don't believe that.' He said, 'It is true.' I said, 'How do you know?' He said, 'Katie knows.' He was all excited, on edge, and shouting. I said, 'Doc, you calm down. That isn't doing you any good. If it is true it is past and gone, and if not true, you will find out about it.' I said, 'You are in no condition to get excited by a thing like that.' "

Mrs. Rose Mason, Hubert Jr.'s wife, testified to a conversation with Mrs. Katie Mason, as follows:

"Q. Now, did you have any conversation with Mrs. Katie B. Mason after the funeral of Dr. Mason with reference to any will?

"A. Yes, the day after the funeral, my husband and I went to the house to see Mrs. Mason, and we were sitting in the living room, and she said, 'I just think you all ought to know that I talked Dr. Mason into making another will because the one he had, the government would take nearly everything."

Mrs. Katie Mason denied making this statement.

Mr. Hubert Mason Jr. denied that he had made a statement attributed to him by Mrs. Katie Mason that he hated his father and that he had often sat with a gun in his lap, undecided as to whether to kill his father or himself. Mr. Mason also denied ever telling Mrs. Katie Mason, as she testified, that he had ever tried to commit suicide.

There are other contradictions in the record, but those noted are the major ones.

There is also in the record considerable evidence tending to show strained or hostile relations between Mrs. Katie Mason and Hubert Jr. and his wife Rose. The incidents are mostly petty and trivial. Before their marriage, Mrs. Rose Mason testified she and Hubert were visiting the Masons and Mrs. Katie Mason "made quite a scene" over a smudge on the rug caused by one of her shoes. She testified that Mrs. Katie Mason never made them feel at home when they visited her; that she complained that they either came without notice, or if they gave notice that she had gone to much trouble preparing for them. On another occasion, Mrs. Rose Mason testified, that she and Hubert Jr. came in unexpectedly at dinner time and they were made to eat in the breakfast room although there were

seats at the dining table. Mrs. Rose Mason also testified that Mrs. Katie Mason told her that she and Hubert must never live in Temple as Hubert and his father did not get along.

Mrs. Frank A. Thompson had known Dr. Mason for forty years. She was one of three friends who attended Dr. Mason's wedding in 1935. Mrs. Thompson testified that Dr. Mason told her that Mrs. Rose Mason was "cold as ice toward" him.

There are, in the record, letters of endearment from Dr. Mason to his son and his family. Dr. Mason branded his cattle "Mason and Son." He referred to his stock farm as belonging to "Mason and Son."

It is indisputable that Dr. Mason loved his wife and her son, his own son and his grandson. If Dr. Mason did not love his daughter-in-law, there was no manifestation of it. His bountiful generosity always included her. In fact, this record reveals that Dr. Mason loved everyone and everyone loved Dr. Mason.

■ Wills are made to be respected. They are not made to be "broken." They represent a most solemn and personal undertaking. A will may be set aside for legal cause. A will may not be set aside because it is not the will some interested person, or some jury, might think the testator should have made.

Dr. Mason possessed all of the qualifications required to make a will. He was unusually capable of weighing the matters to be settled in his will. Dr. Mason knew his son. He knew his son better than any other person. He had a right to judge him when he wrote his will. Dr. Mason may have misjudged his son, but the judgment was his.

We are asked to find that there is evidence to support the jury finding that Mrs. Katie Mason, his wife for twenty-two years, unduly influenced Dr. Mason in the execution of his will.

■ Undue influence was correctly defined by the Trial Judge as follows:

"'Undue influence' as used in the foregoing special issue is such influence or dominion by excessive importunities, imposition, or fraud, exercised at the time of the making of said instrument, as destroys the free agency of the testator and overcomes his wishes in regard to the disposition of his property to such an extent that the instrument does not in fact express his wishes as to the disposition of his property, but those of the person exercising such influence."

■ The "undue" influence which will vitiate a will must be exercised at the time of its making. Besteiro v. Besteiro, 65 S. W.2d 759, Tex.Com. of Appeals.

The only evidence here is that at the time of the planning and making of the will Mrs. Katie Mason attempted to persuade the testator to be more liberal with contestant.

■ The statement attributed to Mrs. Katie Mason that she had "talked" Dr. Mason into making another will is not evidence of undue influence. There is no evidence that any other will existed. Besides, Mrs. Katie Mason had a right to persuade or "talk" her husband of twenty-two years into making a will according to her wishes. In Curry v. Curry, 153 Tex. 421, 270 S. W.2d 208, Mr. Justice, now Chief Justice, Calvert stated:

"* * * It has been held that one may request or even importune and entreat another to execute a favorable dispositive instrument, but unless the importunities and entreaties are shown to be so excessive as to subvert the will of the maker they will not taint the validity of the instrument with undue influence."

Wives have a right to talk with their husbands, a right freely exercised. We would not, if we could, either restrict or discourage free communication between spouses.

■ Evidence that appellee did not receive as much under the will as he expected, or that his own son, his father's wife of twenty-two years and her son who lived with testator since he was a small child and who is now, like his benefactor, a medical doctor, received more under the will of Dr. Mason is no evidence that Mrs. Katie Mason substituted her mind and will for the mind and will of Dr. Mason. Boyer v. Pool, 154 Tex. 586, 280 S.W.2d 564.[2]

■ Whether or not a will makes an unnatural disposition of the estate of a testator must be weighed in the light of all circumstances. Only in the absence of a reasonable basis for the preference is this fact given weight on the issue of undue influence. Curry v. Curry, supra.

■ We find the circumstances here of such nature as to constitute a reasonable basis upon which the testator could naturally dispose of his property as he did.

■ The utterance of Dr. Mason when called to Mr. Brown's office that, "I am not going to do it. I am not going up," is difficult to evaluate. If it had reference to conferring about his will and its execution, the answer is that he did go up to Mr. Brown's office, not once, but twice, after receiving the message; and he did execute his will. Nothing, so far as the record discloses, transpired between receipt of the message and the visits to Mr. Brown's office, which caused Dr. Mason to "go up" and to execute his will against his own volition.

In Thompson v. Townsend, Tex.Civ.App., 238 S.W.2d 810, writ ref., n. r. e., this Court, Chief Justice Archer writing, held that the statement of a testator, "I don't see why I signed them papers for anyway; I didn't want to do it" was no evidence of undue influence in its execution, the Court

saying, "If he had reference to the will, then he had an opportunity to have revoked the will had he cared to do so." Dr. Mason had a similar opportunity if he desired to revoke his will.

It is to be noted that this utterance of Dr. Mason does not imply that his wife or, in fact, anyone was compelling him to do anything. It only indicates the state of his mind which, evidently, he altered. No reason prompting the utterance can be found in the record. Nor does any reason appear for its prompt disobedience.

■ The letter of October 15, 1956, from Dr. Mason to his son, copied above, has complete explanation in the testimony of Mrs. Bosl. Even if unexplained, it is a matter with which Mrs. Katie Mason had no connection. If the letter bespoke the then intentions of Dr. Mason, the fact remains that they changed and he did not leave his property as indicated in the letter. To honor this letter and other expressions Dr. Mason may have made about the disposition of his property at death would make futile the execution of a will. We wish to have no part in the establishment of any such doctrine.

■ If there is evidence tending to show that Mrs. Katie Mason sought to engender estrangement between Dr. Mason and his son, the evidence completely proves her failure. This record will not admit of any conclusion other than that Dr. Mason loved his son and that he provided for him and the other beneficiaries in his will as he thought best, acting free from the domination of any person, and in the exercise of his own will dictated by an intelligent mind and a loving heart.

We sustain appellant's no evidence points, and we do so under the rules applicable thereto as stated in Burt v. Lochausen, 151 Tex. 289, 249 S.W.2d 194.

---

2. "Proof that the daughters were favored and that the contestants got nothing under the will is not proof that the daughters did in fact substitute their mind and will for the mind and will of the testator." 154 Tex. 589, 280 S.W. 2d 566.

If necessary, we would also sustain the points of appellant that the verdict of the jury is against the great weight and preponderance of the evidence as to be manifestly unjust. This we would do from a consideration of all the evidence.

The judgment of the Trial Court is reversed and judgment is here rendered that appellee, contestant, take nothing by his contest.

Reversed and rendered.