G. Frank LIPPER, Individually and as Independent Executor of the Estate of Sophie Block, Deceased, et al., Appellants,

v.

Julian A. WESLOW, Jr., et al., Appellees.

No. 4128.

Court of Civil Appeals of Texas.

Waco.

July 18, 1963.

Rehearing Denied Aug. 8, 1963.

Vinson, Elkins, Weems & Searls, William R. Eckhardt, Houston, for appellants.

Dyess, Dyess, Prewett & Cantey, A. D. Dyess, Jr., Houston, for appellees.

McDONALD, Chief Justice.

This is a contest of the will of Mrs. Sophie Block, on the ground of undue influence. Plaintiffs, Julian Weslow, Jr., Julia Weslow Fortson and Alice Weslow Sale, are the 3 grandchildren of Mrs. Block by a deceased son; defendants are Mrs. Block's 2 surviving children, G. Frank Lipper and Irene Lipper Dover (half brother and half sister of plaintiffs' deceased father). (The will left the estate of testatrix to her 2 children, defendants herein; and left nothing to her grandchildren by the deceased son, plaintiffs herein). Trial was to a jury, which found that Mrs. Block's will, signed by her on January 30, 1956, was procured by undue influence on the part of the proponent, Frank Lipper. The trial court entered judgment on the verdict, setting aside the will.

Defendants appeal, contending there is no evidence, or insufficient evidence, to support the finding that the will was procured by undue influence.

Testatrix was married 3 times. Of her first marriage she had one son, Julian Weslow, (who died in 1949), who was father of plaintiffs herein. After the death of her first husband testatrix married a Mr. Lipper. Defendants are the 2 children of their marriage. After Mr. Lipper's death, testatrix married Max Block. There were no children born of this marriage. Max Block died several months after the death of testatrix.

On 30 January, 1956, Sophie Block executed the will in controversy. Such will was prepared by defendant, Frank Lipper, an attorney, one of the beneficiaries of the will, and Independent Executor of the will. The will was witnessed by 2 former business associates of Mr. Block. Pertinent provisions of the will are summarized as follows:

"That I, Mrs. Sophie Block, * * * do make, publish and declare this my last will and testament, hereby revoking all other wills by me heretofore made."

**1, 2, 3 and 4.**

(Provide for payment of debts; for burial in Beth Israel Cemetery; and for minor bequests to a servant, and to an old folks' home.)

### 5.

(Devises the bulk of testatrix's estate to her 2 children, Mrs. Irene Lipper Dover and Frank Lipper (defendants herein), share and share alike).

### 6.

States that $7000. previously advanced to Mrs. Irene Lipper Dover, and $9300. previously advanced to Frank Lipper be taken into consideration in the final settlement of the estate; and cancels such amounts "that I gave or advanced to my deceased son, Julian."

### 7.

Appoints G. Frank Lipper Independent Executor of the estate without bond.

### 8.

Provides that if any legatee contests testatrix's will or the will of her husband, Max Block, that they forfeit all benefits under the will.

### 9.

" : My son, Julian A. Weslow, died on August 6, 1949, and I want to explain why I have not provided anything under this will for my daughter-in-law, Bernice Weslow, widow of my deceased son, Julian, and her children, Julian A. Weslow, Jr., Alice Weslow Sale, and Julia Weslow Fortson, and I want to go into sufficient detail in explaining my relationship in past years with my said son's widow and his children, before mentioned, and it is my desire to record such relationship so that there will be no question as to my feelings in the matter or any thought or suggestion that my children, Irene Lipper Dover and G. Frank Lipper, or my husband, Max, may have influenced me in any manner in the execution of this will. During the time that my said son, Julian, was living, the attitude of his wife, Bernice, was at times, pleasant and friendly, but the majority of the years when my said son, Julian, was living, her attitude towards me and my husband, Max, was unfriendly and frequently months would pass when she was not in my home and I did not hear from her. When my said son, Julian, was living he was treated the same as I treated my other children; and, my husband, Max, and I gave to each of our children a home and various sums of money from time to time to help in taking care of medical expenses, other unusual expenses, as well as outright gifts. Since my said son Julian's death, his widow, Bernice, and all of her children have shown a most unfriendly and distant attitude towards me, my husband, Max, and my 2 children G. Frank Lipper and Irene Lipper Dover, which attitude I cannot reconcile as I have shown them many kindnesses since they have been members of my family, and their continued unfriendly attitude towards me, my husband, Max, and my said children has hurt me deeply in my declining years, for my life would have been much happier if they had shown a disposition to want to be a part of the family and enter into a normal family relationship that usually exists with a daughter-in-law and grandchildren and great grandchildren. I have not seen my grandson, Julian A. Weslow, Jr. in several years, neither have I heard from him. My granddaughter, Alice Weslow Sale, I have not seen in several years and I have not heard from her, but I heard a report some months ago that she was now living in California and has since married William G. Sale. My granddaughter, Julia Weslow Fortson, wife of Ben Fortson, I have not seen in several years and I was told that she had a child born to her sometime in December 1952, and I have not seen the child or heard from my said granddaughter, Julia, up to this writing, and was informed by a friend that Julia has had

another child recently and is now living in Louisiana, having moved from Houston; and needless to say, my said daughter-in-law, Bernice, widow of my deceased son, Julian, I have not seen in several years as she has taken little or no interest in me or my husband, Max, since the death of my son, Julian, with the exception that Christmas a year ago, if I remember correctly, she sent some flowers, which I acknowledged, and I believe she had sent some greeting cards on some occasions prior to that time. My said daughter-in-law, Bernice Weslow, has expressed to me, on several occasions, an intense hatred for my son, G. Frank Lipper, and my daughter, Irene Lipper Dover, which I cannot understand, as my said children have always shown her and her children every consideration when possible, and have expressed a desire to be friendly with her, and them. My said children, G. Frank Lipper, and Irene Lipper Dover, have at all times been attentive to me and my husband, Max, especially during the past few years when we have not been well. I will be 82 years old in June of this year and my husband, Max, will be 80 years of age in October of this year, and we have both been in failing health for the past few years and rarely leave our home, and appreciate any attention that is given us, and my husband, Max, and I cannot understand the unfriendly and distant attitude of Bernice Weslow, widow of my said son, Julian, and his children, before mentioned."

### 10.

(Concerns personal belongings already disposed of.)

"In Testimony Whereof, I have hereunto signed my name * * *.

        "(S) Sophie Block"

(Here follows attestation clause and signature of the 2 witnesses.)

The record reflects that the will in question was executed 22 days before testatrix died at the age of 81 years. By its terms, it disinherits the children of testatrix's son, who died in 1949. Defendant, Frank Lipper, gets a larger share than would have been the case if the plaintiffs were not disinherited. Defendant Lipper is a lawyer, and is admittedly the scrivener of the will. There is evidence that defendant Lipper bore malice against his dead half brother. He lived next door to testatrix, and had a key to her house. The will was not read to testatrix prior to the time she signed same, and she had no discussion with anyone at the time she executed it. There is evidence that the recitations in the will that Bernice Weslow and her childrn were unfriendly, and never came about testatrix, were untrue. There is also evidence that the Weslows sent testatrix greeting cards and flowers from 1946 through 1954, more times than stated in the will.

Plaintiffs offered no direct evidence pertaining to the making and execution of the will on January 30, 1956, and admittedly rely wholly upon circumstantial evidence of undue influence to support the verdict.

All of the evidence is that testatrix was of sound mind at the time of the execution of the will; that she was a person of strong will; that she was in good physical health for her age; and that she was in fact physically active to the day of her death.

Mrs. Weslow's husband died in 1949; and after 1952 the Weslows came about testatrix less often than before.

The witness Lyda Friberg, who worked at the home of testatrix from 1949 to 1952, testified that in 1952 she had a conversation with Bernice Weslow in which Mrs. Weslow told her if her children didn't get their inheritance she would "sue them through every court in the Union"; that she told testatrix about this conversation, and that testatrix told her "she would have those wills fixed up so there would be no court business", and that she wasn't going to "leave them (the Weslows), a dime."

The foregoing was prior to the execution of the will on January 30, 1956.

Subsequent to the execution of the will, testatrix had a conversation with her sister, Mrs. Levy. Mrs. Levy testified:

"Q. Who did she say she was leaving her property to?

"A. She was leaving it to her son and her daughter.

"Q. What else did she say about the rest of her kin, if anything?

"A. Well she said that Julian's children had been very ugly to her; that they never showed her any attention whatever; they married and she didn't know they were married; they had children and they didn't let her know. After Julian passed away, she she never saw any of the family at all. They never came to see her.

"Q. Did she make any statement?

"A. Yes she did. When she passed away, she didn't want to leave them anything; that they did nothing for her when she was living."

Shortly before she passed away, testatrix told Mrs. Augusta Roos that she was going to leave her property to her 2 children, and further:

"Q. Did she give any reason for it?

"A. Yes. She said that Bernice had never been very nice to her and the children never were over."

Again, subsequent to the making of her will, testatrix talked with Effie Landry, her maid. Mrs. Landry testified:

"Q. Did Mrs. Block on any occasion ever tell you anything about what was contained in her will.

"A. Yes.

"Q. What did she tell you about that?

"A. She said she wasn't leaving the Weslow children anything."

■ The only question presented is whether there is any evidence of undue influence. The test of undue influence is whether such control was exercised over the mind of the testatrix as to overcome her free agency and free will and to substitute the will of another so as to cause the testatrix to do what she would not otherwise have done but for such control. Scott v. Townsend, 106 Tex. 322, 166 S.W. 1138; Curry v. Curry, 153 Tex. 421, 270 S.W.2d 208; Boyer v. Pool, 154 Tex. 586, 280 S.W.2d 564.

The evidence here establishes that testatrix was 81 years of age at the time of the execution of her will; that her son, defendant Lipper, who is a lawyer, wrote the will for her upon her instruction; that defendant Lipper bore malice against his deceased half brother (father of plaintiffs); that defendant Lipper lived next door to his mother and had a key to her home; that the will as written gave defendant Lipper a larger share of testatrix's estate than he would otherwise have received; that while testatrix had no discussion with anyone at the time she executed the will, she told the witness Friberg, prior to executing the will, that she was not going to leave anything to the Weslows; and subsequent to the execution of the will she told the witnesses Mrs. Levy, Mrs. Roos, and Mrs. Landry that she had not left the Weslows anything, and the reason why. The will likewise states the reasons for testatrix's action. The testatrix, although 81 years of age, was of sound mind and strong will; and in excellent physical health. There is evidence that the recitations in testatrix's will about the number of times the Weslows sent cards and flowers were incorrect, to the extent that cards and flowers were in fact sent oftener than such will recites.

■ The contestants established a confidential relationship, the opportunity, and perhaps a motive for undue influence by defendant Lipper. Proof of this type simply sets the stage. Contestants must go forward and prove in some fashion that the will as written resulted from the defendant Lipper substituting his mind and will for that of the testatrix. Here the will and the circumstances might raise suspicion, but it does not supply proof of the vital facts of undue influence—the substitution of a plan of testamentary disposition by another as the will of the testatrix. Boyer v. Pool, supra.

■ All of the evidence reflected that testatrix, although 81 years of age, was of sound mind; of strong will; and in excellent physical condition. Moreover, subsequent to the execution of the will she told 3 disinterested witnesses what she had done with her property in her will, and the reason therefor. A person of sound mind has the legal right to dispose of his property as he wishes, with the burden on those attacking the disposition to prove that it was the product of undue influence. Long v. Long, 133 Tex. 96, 125 S.W.2d 1034, 1035; Curry v. Curry, 153 Tex. 421, 270 S.W.2d 208.

Testatrix's will did make an unnatural disposition of her property in the sense that it preferred her 2 children over the grandchildren by a deceased son. However, the record contains an explanation from testatrix herself as to why she chose to do such. She had a right to do as she did, whether we think she was justified or not.

Plaintiffs contend that the record supports an inference that testatrix failed to receive the cards and flowers sent to her, or in the alternative that she failed to know she received same, due to conduct of defendant Lipper. Here again, defendant Lipper had the opportunity to prevent testatrix from receiving cards or flowers from the Weslows, but we think there is no evidence of probative force to support the conclusion that he in fact did such. Moreover, the will itself reflected that *some* cards and flowers were in fact received by the testatrix, the dispute in this particular area, going to the number of times that such were sent, rather than to the fact that any were sent. See also: Rothermel v. Duncan et al., Tex.Sup., 369 S.W.2d 917.

■ We conclude there is no evidence of probative force to support the verdict of the jury. The cause is reversed and rendered for defendants.

TIREY, J., not participating on account of illness.