Bette Bettes DAILEY, Deceased, Appellant,

v.

John V. WHEAT, et al., Appellees.

No. A14–82–112CV.

Court of Appeals of Texas, Houston (14th Dist.).

Oct. 4, 1984.

Ben H. Schleider, Jr., Carl H. Moerer, Schleider & Francis, Talmage M. Guy, Hany G. Dippel, Houston, for appellant.

Will G. Dickey; Little, Dickey & Stirman, Taylor Moore, Houston, for appellees.

Before J. CURTISS BROWN, C.J., and DRAUGHN and ELLIS, JJ.

## OPINION

J. CURTISS BROWN, Chief Justice.

This is a will contest.

Ruth Bettes, the testatrix, died on June 12, 1980, in a Houston hospital at the age of 84 years. The will dated June 21, 1978, and a codicil dated March 21, 1979, were filed for probate by proponent, John V. Wheat, attorney and financial adviser of testatrix. Under the terms of the will and codicil, Mrs. Bettes left her estate as follows:

1. Specific cash bequest of $50,000 to Wheat;

2. Specific cash bequest of $40,000 to three servants;

3. Specific cash bequest of $10,000 to Grace Daily, one of the five daughters of Contestant;

4. 10% of the residual estate to the Episcopal Church;

5. 90% of the residual estate to charities selected by Wheat to be "used in perpetuity exclusively for the benefit of schools, colleges, universities, churches or other charities which are charitable organizations."

Bette Bettes Daily, testatrix's only child, filed a timely contest. Following a lengthy trial, the jury, in response to special issues, found (1) the testatrix was of sound mind when the will and codicil were executed and (2) the testatrix's will and codicil were not the result of proponent's undue influence. Contestant filed a motion for judgment n.o.v. seeking to set aside the jury findings on undue influence. Such motion was overruled and final judgment was entered on the verdict admitting the will and codicil to probate. Contestant's motion for new trial was also overruled, following which this appeal was duly perfected. Appellees are Wheat, the Protestant Episcopal Church Council of the Diocese of Texas (or Episcopal Church), and the Attorney General of Texas [1]. Appellant assigns ten points of error. She has not made our already difficult task any easier by setting forth her points in an argumentative and multifarious manner. However, we understand the thrust of her arguments, and will attempt to address the claims as submitted.

In her first three points of error, appellant contends (1) that the undisputed evidence shows as a matter of law that undue influence was exercised by Wheat upon testatrix; (2) that by reason of the fiduciary relationship existing between Wheat and testatrix a presumption of invalidity arose which was not adequately rebutted by proponent; and (3) that the jury's finding was insufficiently supported by the evidence or was against the great weight and overwhelming preponderance of the evidence.

A leading case on undue influence is *Long v. Long*, 133 Tex. 96, 125 S.W.2d 1034 (1939). In that case, the jury found that while testatrix possessed testamentary capacity at the time the will was signed, the will was the product of undue influence. The court of civil appeals reversed and rendered, admitting the will to probate. In addressing the question of undue influence, the supreme court stated:

> It is not possible to frame a definition of undue influence which embraces all forms and phases of the term. Every case is different from every other case, and must depend largely on its own facts and circumstances. Generally speaking, undue influence is such influence or dominion as exercised at the time, under the facts and circumstances of the case, which destroys the free agency of the testator, and substitutes in the place thereof the will of another. Undue influence has also been defined as that dominion acquired by one person over the mind of another which prevents the latter from exercising his discretion, and which destroys his free agency. Also, undue influence has been defined as that which compels the testator to do that which is against his will from fear, the desire of

1. .... The Attorney General of Texas is a party to this case by virtue of Art. 4412a, Tex.Rev.Civ. Stat.Ann. (Supp.1981), which, at the time of this lawsuit made him a necessary party to any suit to contest a will containing a charitable bequest.

peace, or some other feeling which he is unable to resist." 42 Tex.Jur., p. 792, Sec. 2, and authorities there cited.

*Id.* 125 S.W.2d at 1035.

The Court further stated:

In spite of the rule just announced, weakness of mind and body, whether produced by infirmities of age or by disease or otherwise, may be considered as a material circumstance in determining whether or not a person was in a condition to be susceptible to undue influence.

A person of sufficient mental capacity to make a will has the right to devise his property as he may see fit, so long as he transgresses no law. Also, a person in making a will rests under no legal obligation to devise his property according to the laws of descent and distribution, or according to any moral law, and the mere fact that a testator has ignored such laws is no ground for setting aside his will. In spite of this, however, the fact that a testator has left a will that is unnatural in its terms, and makes a difference between those who, according to natural law, ought to stand equal as to his property may be considered as a circumstance, along with other circumstances in determining whether or not the will was a product of undue influence."

*Id.* 125 S.W.2d at 1036.

The court in *Long* reviewed the particular evidence at hand and reached the conclusion that a fact issue was presented. Therefore, it reversed the judgment of the court of appeals and remanded the case to that court for consideration of the factual insufficiency points which had not been passed on.

In *Rothermel v. Duncan*, 369 S.W.2d 917 (Tex.1963), a Mrs. Duncan contested the will of Mrs. Rothermel. The jury found undue influence had been exercised upon the deceased by her son, Louis Rothermel. Based upon the jury verdict, the trial court entered judgment in favor of the contestants. The court of civil appeals affirmed. The issue before the supreme court was whether the record contained any evidence of probative value to support the jury's findings. The record revealed that upon the death of his father (Mrs. Rothermel's husband), Louis left school and assumed responsibility of providing support for his mother, sister, and brother. The sister later died. Mrs. Rothermel relied upon Louis to continue support for her until investments made by him for and in her name became sufficient to provide for her. In 1939, she executed her first will, dividing her estate equally between her boys. Some time after his brother's death, Louis took his mother to his farm in Waller County. He employed a woman named Blumenthal to care for his mother and look after his business. Mrs. Rothermel was 93 years of age and suffered from common maladies of age, such as hearing loss and poor eyesight. She also suffered from arthritis and diabetes. She was devoted to Louis and trusted him completely. She relied entirely upon him to handle all of her affairs. In 1957 or 1958, Mrs. Rothermel told Louis she wanted to make another will leaving everything to him. Louis drew the new will, and suggested to his mother that her will provide that if he predeceased her, his daughter would be executrix and the property would be divided equally among the daughter's grandchildren and great grandchildren. No attorney was consulted. On January 30, 1958, the new will was signed by Mrs. Rothermel before appropriate witnesses which were gathered by Louis. Mrs. Rothermel continued to live with Blumenthal until her death in 1958 at 94 years of age. Evidence in the record revealed that Mrs. Rothermel loved the children of both her sons equally. Disinterested witnesses heard Mrs. Rothermel declare numerous times within five years of her death that she intended to leave her estate equally to her grandchildren.

Responding to the issue of undue influence, the supreme court stated that influence is not undue unless the free agency of the testator is destroyed and a testament produced that expresses the will of the one exerting the influence. They added that while one may request or even importune and entreat another to execute a favorable

dispositive instrument, unless the importunities and entreaties are so excessive as to subvert the will of the maker, they will not invalidate the instrument. The court further stated that the exertion of undue influence cannot be inferred alone from opportunity, but there must be some testimony, direct or circumstantial, to show the influence was present, and, in fact exerted. After reviewing the facts set out above, the court held that there was no evidence of such influence. *See also Estate of Woods,* 542 S.W.2d 845 (Tex.1976).

Turning now to the case before us, we note the following. Mrs. Bettes was 84 years old when she died. She was survived by her only child, Mrs. Daily, and her five granddaughters. For several years before her death, she lived alone in a large home in the River Oaks section of Houston. She was at one time a very wealthy woman, but she lost most of her fortune in the 1960's when the T.J. Bettes Mortgage Company collapsed. She was left with her exempt assets, including her home, her jewelry, and some stocks and bonds. Upon encountering numerous financial problems, Mrs. Bettes turned to John Wheat for assistance. Wheat had been practicing law in Houston for many years, and had done some work for the Bettes family or company since the 1950's. During this financial crisis, both Mrs. Bettes and her creditors chose Wheat to act as trustee of her assets, conveying title of the assets to him for the protection of Mrs. Bettes and her creditors. At a later date, Wheat assisted in solving a tax problem that resulted in a substantial tax refund to Mrs. Bettes. From 1970 until her death, Wheat, or someone in his employ, assisted Mrs. Bettes in paying her bills and in handling her affairs, including the preparation of her tax returns. When she became ill, she selected Wheat to exercise her power of attorney. Due to a cash flow problem, Mrs. Bettes had to sell or pledge some of her assets from time to time to pay her monthly bills and her medical and nursing expenses. While she made the decision as to what to sell or to pledge, John Wheat advised her in this regard. In addition, he guaranteed one of her promissory notes. After 1970, Wheat charged Mrs. Bettes no further legal fees. He claimed he did not wish to have her sell anything to pay his fee.

On July 22, 1972, Mrs. Bettes executed a will which created a spendthrift trust for appellant and her daughter, Eliza. On March 22, 1975, Mrs. Bettes executed a will which eliminated the appellant as a major beneficiary of her estate, leaving the bulk of the estate to a spendthrift trust for her granddaughters, Ruth and Eliza. In August 1975, Mrs. Bettes took Ruth and Eliza on a trip to Hawaii. For some reason she seemed to be quite upset when she returned. Mrs. Bettes called an employee of Wheat and advised her that Mr. Wheat had been a good friend, had always stood by her, and had been present when she needed him. Therefore, she wished to make a $50,000 bequest to Wheat. On September 12, 1975, Mrs. Bettes executed a new will which left specific bequests of $50,000 to Wheat, $25,000 to her servants, and the remainder to charity with Wheat as trustee. This will was prepared by Wheat or his law firm. On June 21, 1978, Mrs. Bettes executed the will in question.

At the direction of Wheat, Jack Eckels of the law firm of Chamberlain, Hrdlicka, White, Johnson and Williams prepared the June 1978 will. Eckels had never met nor consulted with Mrs. Bettes before the execution of such will. He had no information concerning testatrix, her estate, nor family relationship. After preparing the will as directed by Wheat, Eckels and two secretaries from his office took it to the testatrix's home on June 21, 1978. Eckels spent five or ten minutes explaining the substantive provisions of the will to Mrs. Bettes. Eckels then gave her the thirteen page will to read which was variously estimated to have taken fifteen minutes to one hour. When Eckels asked Mrs. Bettes if she had any questions, she said she did not. She then duly executed the will. The safekeeping receipt was later sent to Wheat. Mrs. Bettes did not receive a copy of the will, and there is no indication that she ever saw it again.

Although Mrs. Bettes was seriously ill on occasion during the last years of her life, she was mentally alert and competent up until the time of her final illness. Although the evidence suggests that Mrs. Bettes may have indulged in alcohol, there was ample evidence to show that she had no drinking problem at the time the will and codicil under attack were executed. Mrs. Bettes likewise had been prescribed anti-depressant drugs; however, these were discontinued prior to the date of the execution of the will in question.

The relationship between Mrs. Bettes and appellant was a rocky one. During the time they lived together, a number of conflicts and quarrels developed, largely over Mrs. Daily's conduct. Mrs. Daily appears to have had a serious drinking problem but, to her credit, had overcome it many years before the time of the trial. As late as November 1974, Mrs. Bettes' physician noted, "in the last two months she has marked exacerbation of problems relative to her daughter." Mrs. Bettes also told her attending physician in August of 1975 that her family problems were still persisting and remained essentially unchanged. On occasion, Mrs. Bettes asked her doctor to request that appellant not visit her in the hospital during illnesses because appellant made her nervous. Both Mrs. Bettes and Mrs. Daily maintained a certain reserve in their relationship. Mrs. Bettes did not discuss her will with Mrs. Daily nor the fact that she was seeing a licensed social psychotherapist. When Mrs. Bettes sold her jewelry to cover certain expenses, she did not entrust the sale to her daughter, despite the fact Mrs. Dailey worked for a jewelry store and could have made a substantial commission on the sale. In fact, Mrs. Bettes never gave Mrs. Daily power to handle matters on her behalf.

Up until the trip to Hawaii, Ruth Daily was Mrs. Bettes' favorite grandchild and received special treatment in many of the wills executed by Mrs. Bettes. During the month the will under attack was executed, Ruth borrowed $5,000 from Mrs. Bettes to open a business with her boyfriend. She never opened the business and never repaid the loan. During the last years of Mrs. Bettes' life, Ruth Daily chose to call herself Ruth Goldfein rather than Ruth Daily or Ruth Bettes. Ruth was the beneficiary of a spendthrift trust which had a value in 1973 of $175,000. The full amount had been dissipated by the time of trial. In addition, a problem arose regarding granddaughter Eliza while she was employed by proponent's wife. It is unnecessary to detail the event, but would nonetheless justify a change in Mrs. Bettes' attitude.

In contrast, appellant advances the following facts and contentions. The provisions of the will authorize Wheat to select the charity to benefit under the will, including, perhaps, his own foundation if it complied with applicable regulations of the Internal Revenue Service. Under the terms of the will: (1) Wheat has broad investment and selfdealing powers; (2) upon his death, Wheat's powers and benefits as executor and trustee go to his son and then to his daughter; (3) Wheat's liability is limited to bad faith or gross negligence; (4) Wheat is to be compensated for the reasonable costs and expenses incurred in connection with his duties, and such compensation inures to the benefit of his family successors. No time limit is fixed for the charitable donations contemplated, other than compliance with the requirements of the Internal Revenue Service.

In the declining years of testatrix's life, Wheat became her confidant as well as her attorney and financial adviser. He would visit her home to watch sporting events on television. He gave Mrs. Bettes his private unlisted number so that she could call him at any time. Wheat was instrumental in securing the services of the psychotherapist, Ned Bartee, to visit Mrs. Bettes. Wheat kept copies of Mrs. Bettes' various wills and did not provide her with a copy at her home. He maintained all records on her behalf, both relating to her affairs and that of the T.J. Bettes Company. Wheat's secretary handled the details of Mrs. Bettes' affairs after he was appointed her agent by power of attorney in December of 1974. This included the preparation and

filing of all of Mrs. Bettes' insurance and medicare claims, as well as the data for Mrs. Bettes' income tax returns. The secretary received no compensation or gifts from the testatrix for these services. However, she received from Wheat the largest annual raise she had ever received shortly after he filed the will in question for probate.

Despite appellant's contentions, the overwhelming evidence is that Mrs. Bettes was an intelligent and strong-willed woman of sound mind, despite declining health in her last years. She had a testamentary plan which changed many times during the last 30 years of her life. A review of the wills and codicils executed over many years show that appellant and her daughters were mentioned on many occasions, but also show that Mrs. Bettes never intended to leave her whole estate to the appellant or appellant's children. They do reflect Mrs. Bettes' interest in leaving a portion of her estate to charities. They also demonstrate. her unbending confidence in Wheat. For several years Mrs. Bettes knew that appellant and her daughters were not beneficiaries of a major portion of her estate. She confirmed this disposition in conversation with others. Mrs. Bettes was available to appellant to discuss this matter but the relationship between the parties was not such that she could do so. Whatever her reasons may have been, the record supports the belief that she deliberately elected to favor charities rather than appellant. That she incidentally benefitted Wheat, as well as making him a direct bequest, also seemed to be her deliberate decision.

Appellant further contends that the conceded fiduciary relationship between Wheat and Mrs. Bettes gives rise to a presumption of undue influence. She claims that proponent Wheat was required to establish by clear and convincing evidence that the transaction between him and testatrix was fair and equitable. Present Texas law does not support appellant's sweeping conclusions relative to the so-called "presumption." Some Texas cases applying such a presumption deal with intervivos transactions, such as contracts (frequently attorney's fees), gifts of real or personal property, and the holding or handling of assets such as stocks, bonds, etc. For example, *Archer v. Griffith*, 390 S.W.2d 735 (Tex.1964), involved an action to set aside a deed executed by a Mrs. Griffith through her attorney pursuant to the provisions of a contingent fee contract between the parties. The case was tried to the trial court without a jury and without findings of fact or conclusions of law. In upholding the action of the trial court, the supreme court stated that an attorney-client relationship is highly fiduciary in nature; therefore, their dealings with each other are subject to the same type of scrutiny as a transaction between an ordinary trustee and his cestui qui trust. As such, the burden of establishing the fairness of a transaction is on the attorney, based upon the general rule that one who bargains in a matter of advantage with a person, placing a confidence in him, is obligated to show that a reasonable use has been made of those confidential relations with each other. This rule applies to a contract or other transaction relating to compensation, provided the attorney-client relationship was in existence at the time.

Turning now to cases involving wills, we first consider the case of *Lipper v. Weslow*, 369 S.W.2d 698 (Tex.Civ.App.—Waco 1963, writ ref'd n.r.e.), a will contest on the grounds of undue influence. Contestants were three grandchildren of a deceased son of testatrix. The proponents were testatrix's two surviving children, one of whom was Frank Lipper, an attorney, and against whom the undue influence was charged. In 1956, testatrix executed the will in controversy which was prepared by Frank Lipper. Lipper was one of the beneficiaries under the will as well as the named executor. He was a lawyer, and admitted being scrivener of the will. The evidence also showed, however, that testatrix was physically active, and of sound mind and strong will at the time the will was executed. The court, in concluding there was no evidence of probative force to support the jury's

verdict of undue influence, stated that while the contestants established a confidential relationship, the opportunity, and perhaps a motive for undue influence by defendant, proof of this type simply sets the stage. Contestants must go forward and prove in some fashion that the will as written resulted from the defendant substituting his mind and will for that of the testatrix. Further, despite the fact the will and circumstances might raise suspicion, it does not supply proof of the vital facts of undue influence—the substitution of a plan of testamentary disposition of another as the will of the testatrix. The court found no undue influence, stating that "[a] person of sound mind has a legal right to dispose of his property as he wishes, *with the burden on those attacking the disposition to prove that it was the product of undue influence.*" (emphasis added.) *Id.* at 703.

*In re Estate of Willenbrock*, 603 S.W.2d 348 (Tex.Civ.App.—Eastland 1980, writ ref'd n.r.e.), involved a will contest wherein the sole heir-at-law contested the will of Elinda Willenbrock based on lack of testamentary capacity and undue influence by her attorney, a beneficiary under the will. Certain charities who were also beneficiaries under the will intervened. Prior to trial, the parties stipulated that the testatrix possessed testementary capacity, and the sole issue for determination was whether the attorney unduly influenced testatrix to include himself in the will. The jury found that testatrix was acting under undue influence, but the trial court disregarded such finding and entered judgment admitting the will to probate. Appellant attacked the trial court's action, stating that because testatrix's attorney was a beneficiary of the will, it should be presumed that he unduly influenced her to leave bequests to him. In response, the court stated that the fact the attorney occupied a fiduciary relationship with the testatrix, standing alone, was insufficient to raise an issue that the will was executed as a result of undue influence. It further stated that frequently a beneficiary under a will occupies a close family relationship with the testator or testatrix, and while a confiden-

tial or fiduciary relationship may exist, this alone does not prove undue influence. The court concluded that the evidence did not raise the issue of undue influence, and thus affirmed the trial court. While we may question the holding of both *Lipper* and *Willenbrock,* that no fact issue for the jury was presented in those cases, it is nonetheless clear that, as yet, Texas has not adopted the sweeping presumption sought to be announced by the contestant in the case at hand.

▆ In Texas, the rule seems to be established that although one may be sick and aged, one may dispose of his or her property as either he or she may elect, subject to the testamentary disposition being free from undue influence. We believe that a question of fact was raised for the jury in this case, and we decline to disturb the jury's verdict. We overrule appellant's points of error one through three.

▆ In her fourth point of error, appellant argues the trial court erred in refusing to grant a new trial because of the improper admission of evidence previously prohibited by a motion in limine. The trial court granted § 3(a) of appellant's motion in limine which reads:

3. The following matters would not be admissible for any purpose in the cause:

a. That contestant and cross-plaintiff, Bette Bettes Daily, was given by or inherited from her mother Ruth R. Bettes, one-half of the Bettes residence located on Kirby Drive, in the City of Houston, Texas. The facts are that decedent disclaimed her interest in one-half of the residence for federal tax purposes.

As stated in *Wilkins v. Royal Indemnity Co.,* 592 S.W.2d 64 (Tex.Civ.App.—Tyler 1979, no writ):

The purpose of a motion in limine is to avoid the injection into trial of matters which are irrelevant, inadmissible, and prejudicial. *Vega v. Royal Crown Bottling Co.,* 526 S.W.2d 729 (Tex.Civ.App. —Corpus Christi 1975, no writ); *Redding*

*v. Ferguson,* 501 S.W.2d 717 (Tex.Civ. App.—Fort Worth 1973, writ ref'd n.r.e.). The granting or overruling of a motion in limine is not a ruling on the evidence and, therefore, cannot be error. *Redding v. Ferguson, supra; Biard Oil Co. v. St. Louis Southwestern Railway Co.,* 522 S.W.2d 588 (Tex.Civ.App.—Tyler 1975, no writ). *Consequently, the party opposing the admission of certain evidence still has the burden of interposing a specific objection at the time the evidence is offered* (Emphasis added.) *Biard Oil Co. v. St. Louis Southwestern Railway Co., supra; K-Mart No. 4195 v. Judge,* 515 S.W.2d 148 (Tex.Civ.App.— Beaumont 1974, writ dism'd). Therefore, any error in the trial court's refusal to admit or exclude the testimony of a witness must be shown to have been such a denial of appellant's right as was reasonably calculated to cause and probably did cause rendition of an improper judgment. *Vega v. Royal Crown Bottling Co., supra; Clark v. Turner,* 505 S.W.2d 941 (Tex.Civ.App.—Amarillo 1974, no writ); Rule 434 T.R.C.P.

At trial, numerous references were made by appellee to the subject of appellant's motion in limine. Appellant's proper recourse was to object and ask the court to instruct the jury to disregard, and, if such references continued, to move for a mistrial. Appellant argues in her brief that it is "unrealistic" to think that traditional curative actions by the trial court would have been effective, and that such action by her would have aggravated the harm. We disagree. An order from the trial court ruling such evidence as inadmissable upon a first objection by appellant would have prevented the numerous other "improper" references of which appellant complains. In order for complaint to be made on appeal that testimony prejudiced the case in such a manner as was calculated to cause and probably did cause the rendition of an improper judgment, it was necessary for objection to have been made at the time of trial so that the trial court could have had an opportunity to cure the matter by appropriate instruction. *Dodson v. McCoy,* 601

S.W.2d 128 (Tex.Civ.App.—Houston [1st Dist.] 1980, no writ).

■ Additionally, appellant argued at trial, and argues on appeal, that such references opened the door for appellant to introduce evidence of appellee's wealth. We disagree. Appellant has not cited, nor can we find any cases stating, that the wealth of a devisee of a will is material to proving undue influence on the testatrix. We agree that the wealth of the proponent or contestant may occasionally have some bearing on whether there was an unnatural disposition of the testatrix's property. But offering such evidence to rebut *similar* evidence which appellant claims was inadmissible was improper, and the trial court correctly refused such admission. We overrule point of error four.

■ In point of error number five, appellant argues that the trial court erred in (1) refusing to allow appellant's expert witness to testify as to the scope of proponent Wheat's power as trustee and (2) in refusing to lead, on direct examination, an "adverse" witness. Appellant called Charles Dillingham, a tax attorney, as an expert witness to explain the terms of the will and the broad scope of powers given to Wheat as trustee. The trial court refused to allow such testimony. We find no error in the trial court's ruling. The will itself setting out the trust powers was admitted into evidence, and the provisions therein were reviewed on more than one occasion during the course of the trial. Jack Eckels testified that the trust in question conferred broad powers on Mr. Wheat in administering the trust. He also explained the various ramifications of many of the trust provisions. We believe any further testimony *regarding* the complexities of the will provisions fell within the discretion of the trial court.

■ In her same point of error, appellant also contends the trial court erred in refusing to allow her to ask Jack Eckels leading questions on direct examination. We disagree. The allowance of leading questions is a matter resting largely within

the discretion of the trial court, and a case will not be reversed in absence of a showing of abuse of that discretion. *Coronado v. Employees Nat'l. Ins. Co.*, 577 S.W.2d 525 (Tex.Civ.App.—El Paso), aff'd, 596 S.W.2d 502 (Tex.1979). Mr. Eckels was not a party to the lawsuit, nor did he give any indication of being a hostile witness. He willingly explained the provisions of the trust instrument and its broad powers without leading questions by appellant. We find appellant's complaints regarding this issue groundless. Appellant's fifth ·point of error is overruled.

 In point of error six, appellant contends the trial court erred in submitting an explanatory instruction on the Deadman's Statute, TEX.REV.CIV.STAT.ANN. art. 3716, or alternatively, the court erred in failing to grant appellant's requested addenda to said instruction. We disagree. Appellant herself tendered to the court a jury instruction on the Dead Man's Statute in substantially the same form as that prepared by the court. It is well settled that a party cannot complain on appeal when instructions given are substantially the same as those requested by appellant. *American Motorists Ins. Co. v. Ellison*, 364 S.W.2d 83 (Tex.Civ.App.—Waco 1962, writ ref'd n.r.e.). However, appellant requested the following additional instructions: "You are further instructed that Proponent, John V. Wheat, is free to testify as to all other matters except as to transactions with the decedent, Ruth R. Bettes." Appellant claims the court's failure to include the additional instructions, along with its instructions on the Dead Man's Statute, constituted reversible error. We find no merit in this contention. Appellant cites no case, and we know of none, wherein the court is under an obligation to instruct the jury beyond the scope of TEX.R.CIV.P. 182a. Rule 182a provides that:

> Subject to appellate review for an abuse of discretion, the trial court shall in a proper case, where Article 3716 prohibits an interested party or witness from testifying, *instruct the jury that such person is not permitted by the law to give*

> *evidence relating to any transaction or conversation with, or statement by, a deceased person, unless he is called to testify thereto by the opposite party* (Emphasis added.)

Any further instructions would have been surplusage; therefore, the court properly denied appellant's request. We overrule point of error six.

 Appellant alleges, in point of error number seven, that the trial court, when drafting its instructions to the jury, erred in refusing to grant either of appellant's requested explanations of circumstantial evidence with regard to undue influence. Appellant cites no authority bearing on the alleged faults of the instruction given by the trial court, nor any authority in support of the requested instruction. Thus, the presentation is not sufficient to direct our attention to the error with any degree of certainty. *See* TEX.R.CIV.P. 418(d). Without proper development of the specific error claimed, an instruction to the jury will not be condemned. *Texas Employers' Ins. Ass'n v. Villasana*, 558 S.W.2d 917 (Tex.Civ.App.—Amarillo 1977, no writ).

 In point of error eight, appellant contends the trial court erred in severing Wheat's claims for attorney's fees from the will contest. In this instance, even if error were committed, an issue we need not decide, it would be a harmless one. The trial court agreed to bifurcate the trial, allowing the jury to first determine the merits of the will contest. Only in the event appellee was unsuccessful in the main case would it have been necessary for the jury to determine the attorney's fee question. Since appellee was successful in the initial proceeding, there was no necessity for a jury finding on appellee's attorney's fees, and appellee sought no such finding. We fail to see how appellant can claim such severance of the attorney's fees question resulted in the rendition of an improper verdict. TEX.R.CIV.P. 434.

 Appellant also complains of the trial court's severance of her claims against Wheat for an accounting, breach of

fiduciary duties, and a surcharge for delay in selling testatrix's residence. She argues that these matters were an integral part of the will contest and related to undue influence. We find no merit in this contention. TEX.R.CIV.P. 174 authorizes the trial court "in furtherance of convenience or to avoid prejudice" to order a separate trial of any claim or issue. This decision will not be disturbed on appeal absent an abuse of discretion. The trial court stated that any questions regarding a breach of fiduciary duties could be addressed within the context of undue influence and no separate issue need be submitted in the original lawsuit. In addition, it stated that while the issues of surcharge and accounting would "come up under the issues raised here, undue influence and fraud," there was no need to have the jury rule on these matters in the proceeding in question. We cannot see how such a ruling could have harmed appellant, thus causing the rendition of an improper judgment. We overrule point of error eight.

In point of error nine, appellant maintains she was denied her constitutional right to equal protection of the law because she was forced to try her case before six jurors in statutory probate court, rather than before twelve jurors as permitted in district court. TEX.PROB.CODE ANN. § 5 (Vernon 1980 and Supp.1984). Appellant argues that Section 5 of the Probate Code is unconstitutional because it allows contested probate matters filed in counties without statutory probate courts to be heard by district courts. *See* TEX.PROB. CODE.ANN. § 5(b). Appellant complains the effect of this legislation is to permit district court trials with 12 jurors in the less populated counties while limiting the right of probate litigants in larger counties to juries composed of only six jurors.

 In determining whether the legislative basis for a statute outweighs the denial of the constitutionally protected right of redress, a court must consider both the general purpose of the statute and the extent to which the litigant's right to redress is affected. *Sax v. Votteler*, 648 S.W.2d 661 (Tex.1983). Texas has long recognized that legislation limited in operation to only a portion of the state or prescribing different rules for a distinct geographical area is not invalid for denying equal protection where there is a reasonable basis for the distinction and all persons similarly situated in the same place are equally treated. *Mouton v. State*, 627 S.W.2d 765 (Tex.App. —Houston [1st Dist.] 1981, no writ). We hold Section 5 of the Probate Code is not unconstitutional and appellant was not denied equal protection of the law.

 Even if appellant had been denied her constitutional right to equal protection, she has waived the right to complain on appeal. Appellant requested a jury trial by filing her jury fee. After an extensive voir dire, a jury was selected. Not until her motion for new trial did appellant complain of the six person jury limitation. Appellant may not consent to a jury of six before trial and then object to such number only after receiving an adverse verdict. Even a defendant in a criminal case may waive his constitutional right to trial by a six person jury if he waits too long to complain. *See Buck v. State*, 599 S.W.2d 810 (Tex.Crim. App.1980). Point of error nine is overruled.

In her tenth point, appellant contends the cumulative effect of all the alleged errors by the trial court caused the rendition of an improper judgment. In light of our disposition of the other nine points of error, we find no merit in this contention. We overrule point of error ten.

The judgment of the trial court is affirmed.